MINNEAPOLIS SASH & DOOR COMPANY v. GREAT NORTHERN
RAILWAY COMPANY.[1]

June 7, 1901.

Nos. 12,469—(54).

**Railway—Fire.**

In an action against a railroad company for negligently scattering fire by which property adjoining its tracks was destroyed, it is necessary to go further than to show a mere possibility or conjecture that such fire was scattered by one of its engines, to require the submission of that issue to a jury under G. S. 1894, § 2700.

**Submission to Jury.**

Upon the contention that fire was scattered by one of defendant's engines, causing the destruction of plaintiff's property, evidence considered in this case, and *held* insufficient to require the submission of that issue to a jury, and that the trial court properly directed a verdict in defendant's favor.

Action in the district court for Hennepin county to recover $38,341.69 damages for fire caused by sparks from defendant's locomotive. The case was tried before Harrison, J., who directed a verdict in favor of defendant. From a judgment entered pursuant to the verdict, plaintiff appealed. Affirmed.

*Penney & McMillan* and *R. W. Barger*, for appellant.

*W. E. Dodge, Rome G. Brown* and *Charles S. Albert*, for respondent.

LOVELY, J.

Action to recover for a stock of sash and doors destroyed by fire upon the claim that sparks or cinders were scattered by a locomotive engine of defendant passing over one of its tracks adjacent to the property, through its negligence in failing to use proper appliances on such engine, as well as in the alleged negligent operation of the same by its servants. At the close of the evidence the court directed a verdict for defendant. From a judgment entered on the verdict, a case having been duly settled containing the evidence, plaintiff brings the entire record into this court for review.

[1] Reported in 86 N. W. 451.

Several of defendant's tracks running easterly and westerly crossed Harrison street at Minneapolis Junction in that city. On either side of these tracks were many buildings, among them a warehouse, mill, elevator; also residences, barns, sheds, and similar structures of wood; while this place is not to be regarded as a densely populated portion of the city, its description indicates that it was quite thickly settled. Immediately east of Harrison street is the junction yard of the defendant, where there is a roundhouse and office in charge of a yard master, where a record is kept of the arrival and departure of all freight trains going over the tracks in either direction through the yard, through which a grade ascended to the west, but its extent is not shown. At the time in question the defendant's tracks at the junction were used by several companies, and many regular and extra freight trains passed over them during the day at all hours, and were registered. The record of registration, kept under the supervision of the yard master, indicated the time when each train arrived and departed, showing the train number, as well as the number of cars in the train, with other details required in the railroad service. This fact is of much significance in the conclusions which we are required to draw from the record. About one hundred feet north of the defendant's tracks, and adjacent to Harrison street, on the west, was the warehouse of plaintiff, containing the property destroyed. West of the plaintiff's property, and a few feet north of the tracks, was the Excelsior Mill of the Woodward-Holmes Company. Between the mill and the plaintiff's warehouse was a yard, in which there was a lumber shed, the southerly end of which was about one hundred fifty feet north of the tracks. Near the south end of this shed was a small pile of dry basswood bark, "about three arm's full," in which the fire started at 4 o'clock on the afternoon of October 1, 1899. It was discovered by the watchman of the Woodward-Holmes Company, who turned on the fire alarm at 4.07. Five minutes afterwards the department reached the scene. The weather was very dry. A strong wind was blowing from the southeast in the direction of the plaintiff's property. The fire in-

creased with great rapidity, the efforts of the firemen were un-
availing to save the property, and it was totally destroyed.

It is the claim in behalf of plaintiff that an engine of the de-
fendant, drawing a long train of cars, working hard, and sending
forth large quantities of smoke, passed Harrison street going
east between 3.47 and 4.02, from which burning cinders fell into
the dry basswood bark referred to, and started the fire; so that it
became necessary for plaintiff to establish the identity of this
engine and train at the time it passed the junction, as well as that
it dropped fire, to create the presumption that defendant's negli-
gence caused the destruction of plaintiff's property, under G. S.
1894, § 2700. The only reliable evidence which we are able to
find in the record giving the time when trains passed the scene
of the fire during the hour previous is to be derived from the regis-
ter of the yard master. This shows trains passing the junction
as follows: A Great Northern freight train passed east at 3.15,
hauling a train of thirty-nine cars. At 3.35 a Great Northern train
and an engine went west. At 4 o'clock a Chicago, St. Paul, Min-
neapolis & Omaha train and engine hauling fourteen cars went
west. At 4.08 an engine and train of the Chicago, Burlington &
Quincy also went west. The conductor and engineer of the last
train discovered the fire just starting into a blaze. These trains
all passed the scene of the conflagration over the tracks of defend-
ant so near the time stated in the register that any difference
would only be in running to or from the place of registration, a
distance of not more than three hundred feet. The register fails
to indicate that any other engine or train than those referred to
passed the junction during the times stated. The accuracy of the
register in the respects indicated has not been disturbed, and what
it shows is fully corroborated by the statements of the yard
master as well as the servants operating each of the trains des-
ignated; it is not disputed, and hence must be accepted. It is con-
ceded by counsel for the plaintiff that the injury to its property
is not attributable to the 3.15 or 3.35 Great Northern train, and,
without reviewing the evidence at length, it must be said that this
concession is required by the record; so that upon the physical
fact, if established, that cinders were scattered by some engine,

places the responsibility therefor under the claims of plaintiff upon an engine of the defendant going east between 3.15 and 4.02 on that afternoon. The logical result follows that the primary burden of connecting defendant with the injury sustained by plaintiff imposes the necessity upon it of showing that one of defendant's engines passed its warehouse, going east, after 3.15, and so near 4 o'clock that such engine dropped the fire which fell into the basswood bark. This requirement is attempted to be met by the testimony of three witnesses, who, on plaintiff's behalf, stated that an engine of defendant passed the junction that afternoon.

A fair result of the testimony of these witnesses may be summarized in this respect as follows: Hague, the watchman before referred to, says, in substance, that, while standing on the north side of the tracks, near the Woodward-Holmes factory, he saw a Great Northern engine going east over Harrison street, hauling a long train of freight cars, the engine working hard, and emitting large quantities of smoke. He had seen the pile of basswood bark before the passage of the train, when there was no fire in it. He went from the north side of the tracks to the south side, where there was an elevator site. He there saw his wife at a neighbor's house, a short distance away. He then returned to the north side of the tracks, and while at the office of the Woodward-Holmes Company his wife gave him his first information of fire, which he could not see at that time. He ran around the Woodward-Holmes building to the pile of basswood bark, in which there was a small blaze not bigger than a hogshead. He went immediately to the fire box, turned on the alarm, which was conceded to be at 4.07. In giving an account of his movements after he saw the Great Northern pass, in going over the tracks to the elevator on the south, and returning, his designations of time are entirely matters of estimation. He did not undertake to fix the same from any timepiece. Whether he was right or wrong in his different estimates, they were at variance with each other from fifteen to forty-five minutes from the occasion when he saw defendant's engine pass until he got to the blazing bark, and for any purpose essential to accuracy cannot be accepted as the basis

of a conclusion where accuracy would seem to be essentially necessary. The testimony of a Mr. Drake was also indefinite in this respect. He says he saw a Great Northern engine pass, going east, before the fire. The engine which he saw was not emitting smoke, and though he attempted to fix the time it passed near the origin of the fire, it is also a matter of opinion only with him. Neither the witnesses Hague or Drake identified the engine they claim to have seen with any reasonable certainty. Neither witness observed its number, or any name or other mark by which he could recognize it; nor did either have any judgment as to the description of any cars in the train, nor recall a name on one of them. They each draw their conclusion that it was one of the defendant's trains entirely from the size of the engine and character of its smokestack. They say it was a large, heavy engine, with a straight smokestack. There was no evidence to show that the defendant used larger engines than other companies, or that it alone used engines having straight smokestacks. It is hardly necessary to say that such means of identification were too vague, under the circumstances, to distinguish defendant's engine from that of other companies who were daily using the same tracks. A Mrs. Rowe also testified that a Great Northern engine went east shortly before the fire, but she did not see it, as she was in her house at the time, and her impressions are based upon the fact that a Great Northern freight engine went east about the same time (not fixed accurately by her) every day, which does not warrant the claim of plaintiff that one of defendant's regular trains usually passed at the time of the fire.

This evidence, under such circumstances, cannot reasonably be said to conflict with the evidence furnished by the train register. The Great Northern train which is referred to might, allowing for the uncertainty in estimating time, have been the 3.15 train. We have carefully examined the entire record in vain to find other testimony which furnishes any proof that one of defendant's engines went east other than this one, which concededly did not set the fire. We have not thought it necessary to refer to discrepancies and contradictions in the testimony of witnesses for plaintiff, but have endeavored to give the best possible result in its

favor that the record authorizes, which is our duty in reviewing the action of the trial court.

To support the theory that defendant's train scattered fire between 3.47 and 4.02, plaintiff urges that such engine might have gone over tracks converging to the north from Harrison street without registering. It is evident that these tracks, with all others at that place, were a part of the junction yard; and plaintiff's claim in this regard in view of the evidence above referred to, and the uncontradicted testimony of the yard master that all trains passing the junction that afternoon did register, amounts merely to a surmise. Again, in this case the testimony of one witness only (Hague) tends to show that smoke in large quantities was emitted from the engine which he observed. He saw no cinders or sparks whatever. Where a train passing through the open country is followed in close proximity of time thereafter by a fire which starts up near its right of way, by a reasonable process of induction, based upon the physical facts, all other causes of the fire might be excluded, and an inference justified that the fire was dropped from the smokestack; but the facts are quite different here, where other causes might well have intervened to occasion the fire. The obscurity in which the origin of this conflagration is involved is increased by other evidence which tends to show that several boys were seen running away from the fire about the time it started up; and, if conjectures are authorized, or furnish grounds for inference, we might as well indulge the guess that their presence had something to do with the fire as an engine of defendant company, which the evidence fails to show, passed the place of the fire at a time when it could have occasioned the same. It is also as reasonable to attribute the scattering of fire to the Omaha engine and train which passed the junction at 4 o'clock as to any other engine which went by about the same time, but such speculations as the basis of proof against the defendant are not justifiable nor authorized. Neither the Omaha engine, nor the unknown children who ran away from the fire, nor an engine of defendant are to be held responsible upon conjecture, or the jury permitted to settle that question by guesswork.

The rule that a court should not interfere with the undoubted functions of the jury to pass upon the weight of evidence has always been upheld by this court. Counsel have referred us to several decisions where the proposition has been stated in different ways to the effect that "a case should not be taken from a jury where there is evidence to support the verdict," or "where there is evidence reasonably tending to do so." These expressions correctly state the abstract legal rule, but that rule must be applied to each particular issue as it arises; and, where there is no evidence reasonably tending to support a verdict, the duty of the court to say so is imperative. While courts, in that respect, must not usurp the functions of the jury, they may not either ignore the right of any party to demand interference with the privilege of a jury to indulge in conclusions based upon intangible surmises and speculations. The plaintiff attempted to make a prima facie case under the statute against defendant by evidence tending to show that sparks scattered by one of its engines caused the fire. The most that it has done is to show that it was as possible that such an engine might have done so as that the fire might have been occasioned from other causes. Mere possibilities can never establish the probability of a fact requisite to be proved in order to make a railroad company or any party liable in any action whatever. To decide otherwise would be to say that verdicts may rest on mere possibility, speculation, and conjecture. Finkelston v. Chicago, 94 Wis. 270, 68 N. W. 1005; Gainesville v. Edmonson, 101 Ga. 747, 29 S. E. 213; Frier v. President, 86 Hun, 464; Orth v. St. Paul, M. & M. Ry. Co., 47 Minn. 384, 50 N. W. 363. The result of our investigation of this record leads to the conclusion that the trial court did not err in directing a verdict in favor of defendant. We have examined the remaining errors assigned, and do not find them of sufficient merit to require particular notice, or of essential novelty to justify their discussion for precedent.

The judgment appealed from is affirmed.