STATE, BY J. A. A. BURNQUIST, ATTORNEY GENERAL, v.
ALFRED A. PASKEWITZ AND OTHERS.
HENRY NIEMEYER AND BADGER MACHINE COMPANY,
APPELLANTS.[1]

March 30, 1951.

No. 35,291.

[1]Reported in 47 N. W. (2d) 199.

L. J. Lauerman, for appellants.

Young, Gislason & Kunz and H. H. Flor, for respondent Alfred A. Paskewitz.

J. A. A. Burnquist, Attorney General, Arthur Christofferson, Deputy Attorney General, and John H. Rheinberger, Special Assistant Attorney General, for respondent State of Minnesota.

FRANK T. GALLAGHER, JUSTICE.

The state of Minnesota brought this action against Alfred A. Paskewitz, a common carrier for hire, Badger Machine Company, the owner of a trench digger, and Henry Niemeyer, an employe of the machine company, to recover for damage to a bridge on trunk highway No. 19 near Henderson, Minnesota. The common carrier is alleged to have accepted the trench digger for shipment via his truck from a farm near Faribault, Minnesota, to Belview, Minnesota. The digger never arrived at its destination, but was wrecked as a result of an entanglement with the bridge near Henderson, causing considerable damage to the bridge. The jury returned a verdict for the state against all the defendants. Niemeyer and the machine company have appealed from an order denying their motion for judgment notwithstanding the verdict or for a new trial. Paskewitz has not appealed, although he has appeared, urging that the verdict of the jury be allowed to stand. The sole question is whether the state has a right to recover against all the defendants.

Paskewitz owned a 1½-ton Dodge truck. It was the cab-over-engine type, with an ordinary stock rack about 16 feet long, the

wheel base of the truck being about 160 inches. On the steel frame of the truck were wood stringers which extended 4 or 5 feet beyond the steel frame. The height of the platform truck was 3 feet 8 inches from the ground. The rack floor was constructed of wood, and there were no planks on the rack when the machine was driven onto it. The truck rack was about 8 feet wide.

The trench digger operated on tracks and weighed about 7,600 pounds. The over-all length of the machine, including the boom extended out, was approximately 31 feet, the width 7½ feet, and the length of the boom about 15 feet. The intricacies of the construction of the machine are not important here. Mounted to the machine by heavy brackets on each side is the boom, over and under which shovels mounted on a chain driven by a heavy-duty chain operate by means of a combination of sprockets and gears. Above the boom was a sight, which, looking from the top thereof, is described by the designer as being "rectangular, forty to forty-eight inches long, and thirty to thirty-two inches wide, and looking from a side elevation or the side view it would be a sort of a wedge shape approximately on one and coming to a point on the other end." When the boom was raised to its most extreme height, the top part of the sight was approximately 11 feet from the ground. The only portion of the machine which could reach a height of over 12 feet was the sight. The boom itself could not be raised higher than the hood of the trench digger without raising the machine itself and the hood over it.

Paskewitz drove to the farm near Faribault, where the machine had been in operation. It was there that he saw the digger for the first time. Niemeyer was sent by the machine company for the specific purpose of loading the machine onto the truck. The loading was accomplished by Paskewitz backing the truck up to a road approach and Niemeyer then backing the machine onto the truck bed. Prior to the loading, Paskewitz had observed Niemeyer raise the boom in order to clean the shovels. He saw the machine as it was being driven on its own track over to where his truck was parked. To load the machine, it was necessary to raise the boom

in order to get the boom over the cab of the truck. When the machine was resting on the bed of the truck, the boom was again lowered so that it sloped downward slightly, and the highest part of the boom itself was lower than the top of the hood of the machine. The sight extended above the boom. Niemeyer climbed up on the machine and, with the aid of a wrench, loosened two bolts and lowered the sight onto the boom so that it was parallel with the boom and below the top of the hood of the machine, whereupon he retightened the bolts. There was a clearance of about 5 or 6 inches between the lower part of the boom and the roof of the truck cab. The boom extended over the front of the truck cab and rode in a straight line across the center of the cab. The boom could be seen by Paskewitz from where he sat in the cab of the truck. The top of the hood of the trench digger was the highest part of the load, and the height of the machine was 8 feet. Since the height of the bed of the truck was 3 feet 8 inches, this would make a total height of 11 feet 8 inches. Niemeyer testified that the boom could go up and down but not sideways. The boom was not fastened in any way. It was allowed to rest on the cables, but the winch to which the cables were attached was locked. Niemeyer then locked the transmission and engaged the four transmissions. At the front end of the digger and extending about a foot to a foot and a half over the end of the truck was a motor or engine. The center of weight of the digger was slightly forward of the rear axle of the truck, or 10½ to 11 feet from the motor end of the digger.

Niemeyer testified that he had loaded a number of diggers before without removing the sight or boom, although it is admitted that the boom could have been removed for transportation purposes. Other than locking the transmission and putting the transmissions into gear, there was nothing else done to prevent the machine from moving on the bed of the truck. The designer testified that the machine could not move while the transmission was in super-low and that the sight could go up and down if the brackets securing it were loose. The designer of the machine, testifying on his own behalf on cross-examination, said that he could not see how the

nuts securing the sight to the boom could become loosened, either by vibration or by action of the truck. Paskewitz testified that he had nothing to do with the loading other than to tie a rope across the back end of the side racks in order to keep them from swaying, because there was no end gate.

Paskewitz proceeded uneventfully with his load after leaving the farm near Faribault. He made one stop at Montgomery, where he checked his tires and observed that the machine seemed to be in the same position as when loaded. At the outskirts of Faribault he passed through a railroad underpass without any mishap. During the course of his trip, he observed that the machine seemed to be maintaining its position on the truck and that there was no unusual swaying. He testified that he maintained a speed of about 35 miles an hour on the trip. Coming toward Henderson, about 45 miles from Faribault, he drove down a long, steep hill, where the road also curves. The road levels off at the bottom of the hill, and the east approach to the bridge is on this level. Paskewitz testified that he traveled down the grade at about 25 miles an hour and that the road was level for about half a mile before reaching the bridge, but that there was a slight curve about 200 feet from the east approach to the bridge. The highway patrolman who investigated the accident testified that Paskewitz told him that his normal speed up to the time of the accident was 35 miles per hour. The road is divided from the bridge by a slight rise or bump, according to Paskewitz, who testified that he felt the wheels of his truck go over this rise, the front wheels first and then the rear, and that the truck rocked from that bump. We quote his testimony:

"Q. It was smooth up to the time you hit that. Then what happened when you hit this approach to this bridge?

"A. Well, the truck rocked from that bump.

"Q. It rocked some. Well, how did it rock?

"A. Well, the front end went over and the back end went up.

"Q. You mean when you first hit the approach to the bridge?

"A. Yes.

"Q. Which way did the front end of your truck go then?

"A. It raised it up.

"Q. That raised it up. Then what happened?

"A. The back wheels—it kind of raised the back wheels up.

"Q. How much did it raise your truck?

"A. Well, I wouldn't know how much."

The record is confusing as to when the contact between the bridge and the load occurred, but it is clear that Paskewitz was on the bridge when he felt the bump as the load came in contact with the first cross member or portal of the bridge, causing the front end of his truck to rise and the truck itself to go out of control. The truck continued forward, and the machine struck two more cross members, knocking the machine off the platform of the truck and onto the bridge. The truck then continued for a distance of about 15 feet and came to rest on the cement shoulder on the south side of the bridge. The cross member 27 feet west of the east portal was bent west about 8 inches. Twenty feet farther west the second cross member was bent west about a foot and a half. The first cross member, which is called the portal, is about 13 feet from the east end of the bridge and was also damaged slightly. It is about 60 feet from the east end of the bridge to the second cross member, or 47 feet from the lower portion of the portal to the second cross member. Paskewitz testified as to three distinct crashes, but was unable to say which portion of his load had come into contact with the bridge. It is undisputed that the clearance of the bridge was 14 feet 2 inches, thus leaving a clearance of over 2 feet between the cross members of the bridge and the highest portion of the load, assuming that no portion of the machine extended over the top of the hood. It is admitted that no attempt was made to measure the over-all height of the truck and machine. The machine was lying on the bridge about 30 or 40 feet from the east end. It apparently unloaded backwards off the truck.

Examination of the truck after the accident revealed no marks on the roof of the cab of the truck itself. The two U bolts directly

behind the cab of the truck on each side of the frame were broken off, and the two located on the rear of the truck frame were twisted backward slightly. The platform of the truck nearest the cab was raised slightly, and the stringers themselves were split parallel with the truck platform.

The only other evidence worthy of note for our purposes is that both the police officer and the highway engineer deny that there was any bump or rise where the road separates from the bridge. They testified that the approach was smooth.

■ What constitutes a reasonable basis for a verdict upon a motion for judgment notwithstanding a verdict must be determined in the light of the evidence as a whole and not by isolating and considering only the part of the evidence favorable to the verdict. Evidence contrary to the verdict is not to be discarded. Brulla v. Cassady, 206 Minn. 398, 289 N. W. 404; Spensley v. Oliver I. Min. Co. 216 Minn. 451, 13 N. W. (2d) 425. The case against defendants was properly based and tried upon the theory of negligence, and we are satisfied that the rules governing the liability of the carrier to the shipper for damage done to goods in transit are not applicable here. The case before us is one of first impression in this state so far as we can ascertain. Here, a third party is suing the shipper and the carrier for the alleged negligence of both which resulted in damage to the third party.

■ The only question we have for decision is whether there was any competent evidence from which the jury could reasonably find that the manner in which the digger was loaded on the truck by the shipper constituted negligence which proximately contributed to producing the damage to plaintiff's bridge. If there was, then the trial court was justified in submitting that question to the jury and in denying the motion for judgment notwithstanding the verdict. We are concerned only with the claimed negligence of the machine company and Niemeyer, for we regard Rye v. King, 187 Minn. 587, 246 N. W. 256, as being applicable to Paskewitz, who does not deny his own liability, but contends that the other defendants were negligent also.

In the Rye case, a truck driver, for the purpose of turning while in a farmyard, backed his truck in a curved course and ran into a woodpile upon which a small child was sitting. As a result, part of the woodpile was knocked down and the child was injured. We held there that in the absence of any explanation of his conduct the jury was justified in finding that the truck driver was negligent.

When the damage might with equal probability have resulted from the acts of others, as well as the acts of Niemeyer and the machine company, proof of facts other than that of the damage from which their negligence could be inferred must be made before the question could be submitted to the jury. Otherwise the verdict would be founded on mere speculation. Minneapolis Sash & Door Co. v. G. N. Ry. Co. 83 Minn. 370, 86 N. W. 451; Collings v. Northwestern Hospital, 202 Minn. 139, 277 N. W. 910; C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. ed. 1041. An inference of negligence based on an inferred fact, of which there is neither evidence nor predominating probability, cannot safely be made. Johnson v. Arndt, 186 Minn. 253, 243 N. W. 67; Masonite Corp. v. Hill, 170 Miss. 158, 154 So. 295, 95 A. L. R. 157; Collings v. Northwestern Hospital, 202 Minn. 139, 277 N. W. 910.

We are at a loss to see from the record what acts there are on the part of Niemeyer and the machine company from which their negligence can be inferred. Are we to infer negligence in the loading from the fact that the boom was not tied down? If so, how are we to explain the undisputed testimony in the record that the top of the boom, when raised to its extreme height, would be about level with the top of the hood of the machine itself? Or that the highest part of the machine as it rested on the truck was the top part of the hood, a distance of 11 feet 8 inches from the ground, and that the height of the cross members from the floor of the bridge was 14 feet 2 inches? Paskewitz, the only person in a position to know, was unable to testify as to what part of his load hit the bridge, but said that "It couldn't hardly have been the boom," because the truck was on the level. He testified further that the load rocked only somewhat more than a load of potatoes and that

during the course of the trip he observed the boom riding in a straight line across the center of the cab. There was testimony also that the boom was suspended about six inches above the cab of the truck and that an examination of the truck cab revealed no damage to its top. It is readily apparent that the jury would not be justified in finding negligence from this failure alone, particularly where there was a complete lack of evidence that this failure was responsible for the damage. Nor would the jury be justified in finding negligence on the part of Niemeyer and the machine company from the fact that the only part of the machine which could reach a height of 14 feet 2 inches was the sight. The evidence is undisputed that after the machine was loaded Niemeyer tightened the nuts which secured the sight. The designer of the machine testified that because of the weight of the boom it would not be possible for the bolts or nuts to come loose either by vibration or by movement of the load. Here, again, we are confronted by lack of evidence as to what part of the machine hit the bridge. There was no testimony that the sight would spring up above the level of the top of the machine either by its own volition or by bumps in the roadway. In this respect, we regard as unimportant the fact that the truck passed under a railway viaduct without incident, since there was no testimony to show the height of that underpass.

It is true that the shipper assumed the responsibility of loading the digger onto the truck, but there is no evidence in the record justifying the conclusion that the shipper was negligent in carrying out the responsibility it had assumed. The machine was loaded on the truck with apparent care and precaution; the boom and the sight were lowered and secured; and the transmissions were locked to prevent movement of the machine on the truck. Although there was testimony that the boom and sight were easily removable, the failure to remove them does not indicate negligence, particularly in view of the fact that Niemeyer testified that he had loaded a number of similar machines in the same manner, apparently without bad results. There is some testimony in the record as to the loca-

tion of the center of weight of the machine. That testimony itself justifies no inference where there was lack of evidence that the center of weight was such as to constitute negligence in connection with the loading of the machine as was done here, or that the distribution of weight was the proximate cause of the damage complained of.

■ To allow the verdict against Niemeyer and the machine company to stand leaves it based upon speculation and conjecture. Mere proof of the happening of an accident is not enough to establish negligence or its causal relation to the damage. Hagsten v. Simberg, 232 Minn. 160, 44 N. W. (2d) 611. The evidence here gives rise to a number of possibilities as to the manner in which the accident occurred. Where the evidence presents several theories as to the manner in which an accident occurred, on one of which defendant is liable but on the other it is not, then the proof must fairly preponderate in favor of the liability, or the action must fail. Schendel v. C. M. & St. P. Ry. Co. 165 Minn. 223, 206 N. W. 436. Here, the record leaves both the breach of duty relied upon and the causal connection between the damage and the breach in the realm of conjecture and speculation. There is no competent evidence reasonably tending to sustain the verdict, and therefore the motion for judgment notwithstanding the verdict should have been granted as to Niemeyer and the machine company. Taking this view of the case, there is no necessity to consider the motion for a new trial.

Reversed with directions to enter judgment for defendants Niemeyer and Badger Machine Company.