FRED ANDERSON v. NORTHERN STATES POWER
COMPANY.
EUGENE ANDERSON v. SAME.[1]

March 14, 1952.

Nos. 35,807, 35,808.

*Chapman & Chapman* and *Irving H. Green,* for appellants.

*Charles H. Weyl,* for Northern States Power Company, respondent.

KNUTSON, JUSTICE.

Plaintiff Eugene Anderson suffered severe personal injuries when he came in contact with a high-voltage wire owned and maintained by defendant. Two actions were commenced, one by Fred Anderson, the father of Eugene, who is a minor, to recover medical and hospital expenses and loss of earnings of his son during his minority, and the other by Eugene Anderson, by Fred Anderson, his father and natural guardian, to recover for the injuries sustained by Eugene. The cases were consolidated for trial. Verdicts were returned by the jury for plaintiffs in both cases. Motions for judgment notwithstanding the verdict were granted by the trial court, and appeals were taken from the judgments entered pursuant thereto. The appeals have been heard together here. Inasmuch as decision in the Eugene Anderson case is decisive of both, he will be referred to herein as plaintiff.

Wells Memorial, Inc., a charitable organization, maintains a camp for boys at Big Lake, Minnesota. The camp was started about 30 years ago and has been built up over the years. The first building erected was a main lodge, which is still part of the camp. Entrance to the camp is made from a public highway running east and west. Upon entering, one travels in a southeasterly direction, encountering first a toilet or bathhouse, which is to the east of the entrance road about 200 feet from the highway. To the west of the road is the main lodge or clubhouse. At the main lodge is a place where a vehicle may be turned around so as to get back onto the highway. Continuing on from the main lodge, the road runs south for a distance of two or three city blocks, where there is another place for vehicles to turn around. The lake and cottages are located on the west side of the road south of the main lodge. There are woods south of the main lodge, the land east of the roadway being heavily wooded.

At first the camp owned its own electric light plant. In 1935, arrangements were made with defendant to furnish the camp with electricity. The company built a transmission line through the camp property from the south edge thereof to a pole near the bath-

house or toilet, on which is located a transformer which cuts the voltage down to the ordinary 110- and 220-volt current. The current is then distributed through the camp by means of wires belonging to the camp organization. The transmission line consists of two wires hanging on crossarms. The wires are 4 feet 11 inches apart, one wire carrying a 4,000-volt current, the other being a neutral or ground wire, carrying no current. The wires are 25 feet 4 inches above the surface of the ground. The transmission line goes through woods some distance east of the road mentioned above. The area through which the transmission line runs is heavily wooded. A clearing had been made through the woods for the line. Prior to the time here involved, there were no cabins or other buildings in the area followed by the transmission line.

During the winter of 1949-1950, the trustees of the camp organization decided to build an additional cottage or bunkhouse. Sometime during the month of May 1950, Wells Eastman, one of the trustees, and others connected with the camp selected the site for the new cottage and placed stakes where it should be built. The site selected was on a rise in a small clearing in the woods about three blocks south of the main entrance and 200 feet east of the camp roadway. It was located directly under the wires of the power company's line as it then existed. Henry B. Anderson, the camp caretaker, who had looked over the site of the new cottage after Mr. Eastman had staked it out, some time later had occasion to talk over the telephone with Mr. Eastman about the matter. He was asked by the latter what he thought of the spot, and he replied: "It is a nice spot, but did you notice it is right under those wires." Eastman answered that "if we think we got too close to that, we will have them moved." There were no other cottages nearer than 150 feet from the site selected for the new cottage. There was a path running to the roadway from the site selected, and it was also possible to drive to the new cottage from the roadway in a roundabout way.

During the latter part of May 1950, a carpenter by the name of Noel E. Landes was hired to erect the new cottage. He was au-

thorized to hire his own help as needed, the help to be paid by Wells Memorial, Inc. When he was shown the place where the cabin was to be built, he told Eastman that it would be directly underneath the electric wires. Eastman replied that if the wires were in the way he would notify the power company to remove them.

Landes proceeded to build the cabin. He hired another carpenter by the name of William J. Christenson and plaintiff Eugene Anderson as an assistant. Plaintiff was then 15 years of age. On June 8, the cabin had been so far completed that the men were working on the roof. The building was so constructed that the roof, which was of a V-type, was 4½ feet from the so-called "hot" wire, which carried 4,000 volts of electricity, and 3½ feet from the neutral wire. The center of the roof, as will be seen, was not squarely between the two wires, which accounts for the difference in distance between the roof and the wire on one side and the roof and the wire on the other side. While working on the top of the roof, plaintiff came into contact with the wires and was severely burned. No one witnessed the accident, and plaintiff does not recall what happened.

Plaintiff contends that defendant was negligent in the following respects: (1) That it failed to insulate its wires; (2) that it failed to erect warning signs showing that the line carried a high-voltage current; (3) that it failed to make reasonable inspections; and (4) that it failed to move its line or otherwise protect the workmen from harm after discovering the close proximity of its wires to the top of the new cottage.

■ The applicable law respecting the care required of electric companies owning and operating lines distributing or carrying heavy voltage currents of electricity is well settled. Electric companies erecting and maintaining lines for the transmission of high-voltage currents of electricity are held to a high degree of care. They must exercise care commensurate with the peril reasonably to be apprehended to those who may have occasion to come in proximity to them. In Bunten v. Eastern Minnesota Power Co.

178 Minn. 604, 607, 228 N. W. 332, 333, where many of the cases are collected, we said:

"Those engaged in transmitting such a dangerous force as electricity, which gives no warning of its presence and is not apparent to the senses, are required to exercise a degree of care in constructing and maintaining the wires over which it is transmitted commensurate with the danger to be apprehended from contact with such wires or the escape of electricity therefrom; * * *."

That rule has been followed and repeated in numerous cases since. See, Neumann v. Interstate Power Co. 179 Minn. 46, 228 N. W. 342; Faribault v. Northern States Power Co. 188 Minn. 514, 247 N. W. 680; Keep v. Otter Tail Power Co. 201 Minn. 475, 277 N. W. 213; and Schroepfer v. City of Sleepy Eye, 215 Minn. 525, 529, 10 N. W. (2d) 398, 401, where, after stating the general rule, we said:

"Conversely, where a distributor of electricity places its wires in such a way that there is no reasonable ground to anticipate that people will come in dangerous proximity to them, there is no breach of legal duty and consequently no basis for a charge of negligence."

The latest case wherein this rule has been considered is Knutson v. Lambert, 235 Minn. 328, 51 N. W. (2d) 580.

■ The distributor of electricity is not an insurer against accidents or injuries. Bunten v. Eastern Minnesota Power Co. and Keep v. Otter Tail Power Co. *supra.*

■ In the application of these rules to the facts of the case now before us, it must follow that negligence cannot be predicated upon a failure to insulate unless defendant could reasonably anticipate that someone would come in such close proximity to the line that an uninsulated wire would cause injury or harm. In the Bunten case we said in that respect (178 Minn. 608, 228 N. W. 334):

"* * * where an electric company maintains its wires at a height at which they would not come in dangerous proximity to such per-

sons or things as it reasonably ought to anticipate might rightfully come under or near them, it is not chargeable with negligence because someone doing an act which it had no reason to expect suffers an injury which might not have been sustained if the wires had been higher. [Citing cases.]

"It is the duty of an electric company which maintains high voltage wires *at places where people* have the right to be and *are likely to come in contact with them* to guard against danger from the wires by effectively insulating them or by providing other sufficient safeguards. [Citing cases.]

"But it is required to provide such insulation or other safeguards only at those places where in the exercise of reasonable prudence and foresight it ought to anticipate that injury might result to some one in the absence of such protection." (Italics supplied.)

In the above case, we quoted with approval the general statement of the law respecting insulation found in 9 R. C. L. 1213, § 21. Substantially the same rule is now found in 18 Am. Jur., Electricity, § 97, where it is stated as follows:

"That the duty of providing insulation should be limited to those points or places where there is reason to apprehend that persons may come in contact with the wires is only reasonable. Therefore, the law does not compel companies to insulate and adopt safeguards for their wires everywhere, but only at places where people may legitimately go for work, business, or pleasure—that is, where they may reasonably be expected to go."

Here, there was no reason to anticipate that anyone would come in contact with the wires as they existed prior to the erection of the new building. It could hardly be said that defendant should have anticipated that the owners of the premises would proceed to build a new structure directly under its wires and in close proximity thereto without first giving defendant an opportunity to move the wires or otherwise protect workmen from injury. Where a line has been safe until it is made dangerous by the act of a third party which could not reasonably have been anticipated by the

distributor of electricity, negligence cannot be predicated upon the failure to make such line safe from the changes brought about by the action of such third party, in the absence of notice to the one responsible for the maintenance of the line. See, Mirnek v. West Penn Power Co. 279 Pa. 188, 123 A. 769.

■ The same can be said of the failure to erect warning signs. 18 Am. Jur., Electricity, § 97; Bujol v. Gulf States Utilities Co. (La. App.) 147 So. 545, 547, where the court said:

"* * * We have not been referred to any law or custom which requires the posting of such signs in places like this, where it is not reasonable to expect people to come in contact with the heavily loaded wires."

■ Plaintiff next contends that defendant was negligent in failing to properly inspect its lines. The record shows that an inspection was made on April 24, 1950, about one month prior to the commencement of the erection of the new building. The National Electrical Safety Code, § 213, provides in part:

"Lines and equipment shall be systematically inspected from time to time by the person responsible for the installation."

It may be admitted that the degree of care imposed upon a distributor of electricity requires reasonable and proper inspection (18 Am. Jur., Electricity, § 100; 1 Joyce, Electric Law [2 ed.] § 438b) ; but such inspection is intended primarily for the purpose of discovering and correcting defects in its lines or its apparatus. Here, the accident was not the result of defective lines or apparatus, but, instead, resulted from the creation of a dangerous condition by the act of a third party in changing that which had been safe to something which became dangerous by the erection of a structure which brought people into close proximity with the dangerous lines where people had not been expected to be before. The evidence in this case does not warrant a finding of negligence based on a failure to inspect.

■ We come, then, to the final and most serious contention of plaintiffs, and that is that defendant had notice of the location of the

building and its close proximity to its wires and that it negligently failed to move its lines or otherwise protect those whom it reasonably might have anticipated would suffer injury if it permitted the lines to remain as they were. It is admitted by defendant that if its employes saw the new cottage and the close proximity of the wires to the roof it would be the duty of such employes to notify the company and to stop work on the cottage until the danger inherent in such situation could be eliminated. It is conceded by plaintiff that no one ever notified defendant that the cottage was being built or requested that the line be moved. To establish this claim, plaintiff Eugene Anderson testified that some days prior to the accident he passed the main lodge while returning from his noon lunch on his bicycle and that he then saw "an R. E. A.— Northern States truck in the yard" near the main lodge. He stated that one man was on the pole on which the transformer was located and another was in the truck. He returned to his work on the roof of the new building and said that while there he saw the truck come up the roadway and turn around; that he waved at the men in the truck; and that one of the men waved back. They were then not quite a city block away from him. He stated that the truck was green and that it had "Northern States" lettering on it.

Eugene's coworker, Christenson, testified that in the forenoon of a day before the accident he saw a Northern States truck within a few rods of the cottage. He variously estimated the distance to be two rods, within a few rods, or "something like that." He did not state where it was other than that it was on the road leading up to the building. He would not say whether it was in sight of the building. He was asked on cross-examination by plaintiff's counsel:

"Q. Did you see a Northern States Power truck there a few days before this accident?

"A. Yes, there was. There was one forenoon, I forget what time it was.

"Q. How many days before this accident was it?

"A. Well, that I couldn't remember either, but it was sometime before.

"Q. Was it while the building was going up?

"A. Yes.

"Q. How close to the building was this Northern States Power truck?

"A. Well, it was perhaps a few rods down.

"Q. Was it within sight of the building?

"A. Well, it was within a few rods from the building."

Neither party pursued the matter further. He also stated that the truck was green. He did not say how far the building operation had proceeded when he saw this truck, nor did he say whether the roof was on at all. Christenson was called by defendant, and when it appeared that his testimony was adverse, defendant's counsel claimed surprise and was granted leave to cross-examine the witness. Thereupon, a statement signed by the witness on the day of the accident was received in evidence, in which he stated, among other things:

"I had never warned the Northern States Power Co. about the cabin being built under their lines. I have never seen any employees or trucks near the building or at the building."

While he claimed that he did not read the statement before signing it, he admitted that it was read to him by a representative of defendant, who wrote it. His attempt to repudiate the statement is far from convincing. His testimony, taken as a whole, is insufficient to justify an inference that defendant had knowledge of the close proximity of the roof of the new building and its lines. Neither is his testimony corroborative of that of plaintiff. Christenson claims that he saw such a truck in the forenoon. Plaintiff testified that he saw the truck after he had his lunch. The trucks were allegedly seen in different places. They could not have both seen the same truck on the same occasion.

Defendant called all its employes who might have had anything to do with the maintenance or inspection of the line involved. This line was maintained by men located at Monticello. It was inspected by a man having his headquarters at St. Cloud. All denied having been on the premises during a time previous to the accident when they could have seen the new building. The truck the maintenance men used was exhibited to the jury. It was of a tan color. It had a small insigne or emblem of the power company on the door, but no "Northern States" lettering, as testified to by plaintiff. Thereafter, plaintiff was called back to the stand and identified the truck as the one he had seen. When his attention was called to the fact that it was not green, he stated that he called it "more of a pea green."

Noel E. Landes, who was in charge of the work, saw no Northern States Power Company truck on the premises. Neither did Henry B. Anderson, the caretaker in charge of the camp. There was a green panel truck, owned by W. F. Banke Electric Company, working near the main lodge on June 6 and 7 and also about a week before the accident. Harry Skogquist, who was in charge of this work, testified that at that time he was up on the transformer pole near the main lodge. He saw no Northern States Power Company truck on the premises while he was there.

The new cottage could not be seen from the main lodge because of the trees and brush between the two. If defendant's employes are to be charged with knowledge of the danger involved, it must be based on the testimony of plaintiff that he saw one of defendant's trucks drive within a block of the new cottage a few days before the accident and an inference drawn therefrom that the occupants saw the cottage and the relative position of the wires at that time. We have not been shown photographs of the entire area intervening between the cottage and the place where the turn was made, but we do have some photographs showing the cottage, and it is apparent therefrom that it was surrounded by trees in full foliage much higher than the cottage itself. We have attached one of such photographs hereto for illustrative purposes. If, as plaintiff

testified, a Northern States Power Company truck did drive to within one block of the cottage and one of the occupants thereof waved at plaintiff, the truck would be facing the cottage and the line at approximately right angles; and even if we accept the testimony that plaintiff saw such truck, inconclusive as it is, we would still have to infer that the occupants of the truck, in the brief space of time during which they made the turn, saw through the trees the relative location of the new cottage and the wires and the close proximity of the roof to the wires. At that distance, it is highly unlikely that they could see the wires at all, keeping in mind that they were looking through heavy foliage on trees. It is even more unlikely that they could gauge the relative location of the wires with respect to the roof of the building and determine whether the wires were on the side of the building or immediately over it. It is apparent that if the building had been placed only a comparatively few feet farther to one side or the other there would have been a safe clearance between the roof and the wires. From the view which defendant's employes had, it would be next to impossible to determine that the building was directly under the wires. They could hardly be expected to assume that anyone would place a building in such dangerous proximity to the wires.

■ An inference of negligence based on an inferred fact, of which there is neither evidence nor predominating probability, cannot safely be made. Collings v. Northwestern Hospital, 202 Minn. 139, 277 N. W. 910; State, by Burnquist, v. Paskewitz, 233 Minn. 452, 47 N. W. (2d) 199. Here, we are asked to base an inference of negligence upon an inference that defendant's employes, while about a city block away and in the act of making a turn with a truck in which they were then riding, saw, while looking for a brief moment through trees covered with heavy foliage, the electric lines running parallel with the roof of a building, both of which were approximately at right angles to the employes, and that they gained from such observation knowledge of the close and dangerous proximity of such lines to the roof. The burden rested on plaintiff to prove not only that defendant's employes

had an opportunity to look, but that if they did look they could have seen the wires and their relative location to the roof. The mere fact that they might see plaintiff at the distance which separated them does not establish that they could see the wires and their close proximity to the roof. An inference based wholly on such conjecture and speculation is insufficient to establish plaintiff's cause of action.

Since plaintiff has failed to prove actionable negligence, defendant was entitled to a directed verdict. In view thereof, we need not determine whether plaintiff was guilty of contributory negligence as a matter of law. The trial court correctly granted judgment notwithstanding the verdict, and the judgments entered thereon are affirmed.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER and MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.

---

[1]Reported in 52 N. W. (2d) 458.