**OTIS ELEVATOR COMPANY, a Corporation, Appellant,**

v.

**Dorothy YAGER, Trustee of the Estate of Harry Yager, Decedent, Appellee.**

**No. 16089.**

United States Court of Appeals
Eighth Circuit.
June 29, 1959.

Johnsen, Circuit Judge, dissented.

William P. O'Brien, St. Paul, Minn. (Cummins, Cummins, Hammond & Ames, St. Paul, Minn., on the brief), for appellant.

Michael A. Kampmeyer, St. Paul, Minn. (Harry S. Stearns, Jr., and Stearns & Kampmeyer, St. Paul, Minn., on the brief), for appellee.

Before GARDNER, Chief Judge, and JOHNSEN and VOGEL, Circuit Judges.

GARDNER, Chief Judge.

This action was brought by appellee as trustee of her deceased husband's estate to recover damages for his death by wrongful act of appellant. In the course of this opinion appellee will be referred to as plaintiff and appellant as defendant. In her complaint, plaintiff charges:

"VI. That sometime prior to the 29th day of October, 1956, defendant sold and installed a certain elevator system in premises located at 408 St. Peter Street in the City of St. Paul, State of Minnesota known as the Hamm Building; that said system consisted of four elevators and shafts, doors, and other appurtenances and accessories thereto extending from the top floor of said building to the sub-basement thereof and that one of said elevators and facilities relating thereto was known as elevator number two; that as part of said system as required by law said system was so designed and constructed so as to prevent the opening of the doors to the elevators except and when the elevator was stationed at the floor of the door to be opened; that on the second floor of said building the door to elevator number two was so designed so as to have a small hole through which a pin was to be inserted to permit authorized personnel to open said door from the outside floor level when said elevator was stationed at said floor.

"VII. That after the sale and installation of said elevator systems and extending up to and through October 29, 1956, and to the present time, defendant maintained control of said elevator system including elevator number two and agreed with the owners thereof to repair, service and maintain said system in a safe and workable condition and so as to conform to the laws of the State of Minnesota and the rules and regulations of the Industrial Commission of said State.

"VIII. That in fact defendant so negligently repaired, serviced and maintained said elevator system so as to permit it to get into a severe state of disrepair; that it permitted the mechanism for locking the second floor door of elevator number two to become inoperative, that it failed to properly inspect and repair said mechanism, that it knew or should have known that said mechanism had or would become inoperative so as to permit said door to open when the elevator was not at the landing and that it failed to warn persons lawfully using the elevator thereof.

"IX. That on or about October 29, 1956, plaintiff's decedent Harry Yager while performing his regular duties as an employee of the Hamm Building was required to use said elevator, that he opened the door of elevator number two on the second floor and that said elevator was not at said landing but nevertheless the protective mechanism failed to properly operate and said doors opened causing plaintiff's decedent to fall and be thrown into said elevator shaft where he fell a distance of three floors into the bottom of the shaft in the sub-basement receiving numerous and severe injuries which caused his death thereafter; that said accident and the death of plaintiff's decedent were directly and proximately caused by the negligence and carelessness of defendant."

Defendant, by its answer to plaintiff's complaint, admitted all allegations going to the jurisdiction of the court, denied all alleged acts of negligence, admitted that it had sold and installed the elevators in the Hamm Building and that it had agreed to maintain the same, but denied that it retained control of said elevator system. It affirmatively alleged that:

"* * * at all times the operation, use and control as well as the right of operation, use and control

was at all times referred to in the Complaint solely and exclusively in the owners and operators of the Hamm Building premises as well as their agents and servants including the plaintiff's decedent."

While admitting that plaintiff's decedent died while on the premises of the Hamm Building, it affirmatively alleged that:

" * * * said death was caused by his own act or negligent acts and omissions and the negligence of others in no way under the control of this defendant, and further alleges that the plaintiff's decedent assumed the risk of known dangers while attempting to operate and use said elevator system without qualifications and supervision and while in the employment of those managing and operating the Hamm Building premises."

The premises referred to in the record as the Hamm Building is a six story structure located in the City of St. Paul, Minnesota, and is occupied by business tenants, doctors, lawyers, dentists, etc. It is adjoined by a department store known as Schunemans, and Schunemans occupy a large part of the basement of the Hamm Building. The Hamm Building is owned and managed by United Properties, Inc., a corporation, with offices in said building. For the service of its tenants, it provides four electrically man-operated passenger elevators which are located in a group at the east side wall of said building and about centrally located in said building. The elevators are numbered consecutively from left to right. The four elevators were constructed by defendant, Otis Elevator Company, and installed in said building by defendant in 1919. There is a shaft for each elevator; one, two, and four shafts extend upward from the basement to the sixth floor; number three shaft extends downward to a sub-basement three or four feet deeper which is one floor lower than the Schunemans basement and is entered through a locked mesh covered door. The base of the shafts are known as "pits". The shafts are not separated by walls but the shafts do contain the guide rails on which the elevators run. The six floors in said building each have four entranceways to said elevators with sliding doors attached to said entranceways. All said doors are substantially identical except on the second floor where the doors, except elevator number three, have a keyhole therein and a warning sign thereon. This warning sign is printed in large letters at the keyhole, reading as follows: "Warning—Be sure car is here before entering." The number three elevator door has a similar keyhole in the basement. To insert into this keyhole on the elevator doors on the second floor a key is provided. It is six or eight inches in length and about an eighth of an inch in diameter. This key is used by the owner's employees at the Hamm Building to open the elevator doors on the second floor and is kept for said use by United Properties maintenance employees in the base of cigarette holders or stools alongside the elevator doors. The purpose of the keyhole is that when the operator leaves the elevator unattended and closes the doors, the key is a means of opening the doors from the outside to re-enter the elevator. A so-called parking device is to prevent the opening of the doors more than three or four inches when the elevator car is not at the floor. Above the sixth floor and immediately over the four elevator shafts is the "penthouse". In this small building is located the mechanical equipment to raise and lower the elevator cars.

Harry Yager, plaintiff's intestate, at and for some two and a half years prior to the accident involved in this action was employed by the owners of the Hamm Building as a night janitor or maintenance man. His general duties were to do cleaning in offices and washrooms. He was not a licensed elevator operator, although such licenses were required by the City of St. Paul. On the date of the accident, he commenced his work at the Hamm Building at 5:31 p. m. A short time thereafter he was observed on the sixth floor by his super-

visor, Mr. Tewksbury, standing at the number three elevator, apparently waiting for the number three elevator to pick him up. The number three elevator is used for night service for transporting persons coming in and leaving the building. The number three elevator car and its operator rest on the main floor when not in use. The number two elevator was used by Mr. Tewksbury to go from floor to floor and Mr. Yager was supposed to use number one elevator for his work. Mr. Tewksbury did not observe Mr. Yager get on the number three elevator. Mr. Sweeney, the night elevator operator on number three elevator, came to work at 6:00 p. m. on that day, and he picked up Harry Yager with number three elevator on the sixth floor and took him to the second floor where he got off. At about 6:30 p. m., Mr. Yager was observed by Mrs. Olding, a co-employee, standing near the elevator doors on the second floor in a bent-over position, as though he were listening. Within a short time thereafter Mr. Sweeney heard a noise in the number two shaft. He did not report it to Mr. Tewksbury because within a short time thereafter Mr. Tewksbury rang him to come to the second floor and said, "Harry fell down", or something like that, and asked him to come down with him. Mr. Sweeney and Mr. Tewksbury drove the number three elevator to the sub-basement. When they reached the basement they found Mr. Yager lying in the number two shaft pit. He was still alive but did not talk. Mr. Tewksbury found the pin for opening the door on the second floor lying in the pit and also Mr. Yager's cigarettes and glasses. Mr. Yager was removed from the shaft within a short time thereafter and later died from his injuries.

Not long afterwards that same evening police officers made strong attempts to open the second floor door of number two elevator. They took the key and used it in the lock and these police officers tried to force the door and see if they could open it but they were unable to do so. Mr. Tewksbury had used car number two since 1950 and he testified that he had never had an occasion where he was able to open that door without the car being there during that time. On the date of the accident an Otis Elevator maintenance crew was cleaning down the number one and number two shafts at the Hamm Building. They had already done number one shaft and were in the process of cleaning number two shaft and had gotten down to the third floor level in the number two shaft at the completion of their work on that date. Mr. Miller, electrician for United Properties, was in the pits of the number one and number two elevator shafts around 4:00 p. m. on the date of the accident and found them clean. He turned out the lights and locked the gates. He observed no iron bar in the pit of the number two shaft. The following day at about 7:45 a. m. or 8:00 a. m., having heard about the accident, Mr. Miller went to the number two elevator shaft pit and found an iron bar which he removed and delivered to the United Properties office and placed it in its vault, and he obtained it from the vault and produced it in court.

Mr. Mohwinkel, day foreman for United Properties, testified that on the day following the accident, when he arrived at work at 7:00 a. m. he opened the elevator doors on the number one and two elevators while the cars were on the second floor level, as is his customary practice to ready the elevators for the operators. Later, at about 7:30 a. m. he testified he tried to open the number two elevator door on the second floor when the elevator was down on the first floor and that he was able to open it with the key. After the key broke the interlock, he pushed the doors open about two or three feet. The catch should stop the door at about five or six inches but he pushed it beyond that to about two or three feet and he could see the elevator down on the main floor. He had never tried to open the doors previously when the elevator was not there.

Mr. Kelly, the City Elevator Inspector, and Mr. Stromwell, the State of Minnesota inspector, arrived at the building the early morning on the day following

the accident. They were informed by the Hamm people that decedent fell from the second floor and they then made an inspection of the second floor door on the number two shaft. These inspectors tried every way they could to open the doors when the elevator was not there and were not able to do so. They found nothing wrong or defective with the closer that would cause it to fail. They tried in every way they knew how to open the door and couldn't do it, and even tried forcing the door past the four inch opening without success. These men then inspected the other three elevators and found nothing wrong with them. Mr. Stromwell and Mr. Kelly got on top of number two elevator and tried to fool the locking device by various means to try to open it beyond the four inch distance, but were not able to do so. They then tried fooling with the parking key from the outside to see if they could open the door, but were unable to do so. They examined the mechanism of the locking device and all its working parts; everything seemed to be free and in good working order, and the mechanism appeared to be well lubricated. The parking device on the elevators on the second floor is a standard piece of equipment that is acceptable to the city and acceptable to the national code. These closers were installed in 1947, and Mr. Kelly inspected them thereafter and approved the device and the installation, and from 1947 until the time of the accident, Mr. Kelly made annual inspections of the elevators in the Hamm Building, and he testified, and his reports show, that the elevators and equipment were in "good order".

Plaintiff retained one Harold Cartier, a civil engineer employed by Twin City Testing Laboratory, St. Paul, Minnesota, to examine and inspect the elevators. Witness first went there seven or eight months prior to date of trial and on that occasion went up into the control room in the penthouse to ascertain how the elevators worked on the top floor of the building. Mr. Stearns, attorney for plaintiff, was with him at the time.

Some six months later, witness looked at the doors of the elevator. Mr. Stearns was with him and Mr. Kampmeyer, also a lawyer, and they went into the shaft on that occasion. Nobody was there from Otis Elevator and it was done after working hours. The evidence will be further developed in the course of this opinion.

At the close of all the evidence, defendant moved for a directed verdict, which motion was denied, and the case was submitted to the jury on instructions to which defendant saved certain exceptions. After the jury had been deliberating on the case for some time, it returned for further instructions, whereupon the following proceeding occurred:

"The Court: The Court is informed that the jury desires further instructions. Who is the foreman?

"Jury Foreman: I am, your Honor.

"The Court: Do not tell me how you stand. I should not hear whether you are equally divided, or so many for the plaintiff and so many for the defendant, or what your situation is in that regard. I will ask you what the problem seems to be before the jury, what additional instructions, or instruction on what issue or problem you desire to know about? You may explain that, Mr. Foreman.

"Jury Foreman: Well, there are some members that think that the United Properties are involved. They won't change their mind.

"The Court: I think there is no controversy about the United Properties' position in the case. The plaintiff in this case is Dorothy Yager, Trustee of the Estate of Harry Yager, Deceased. The defendant is the Otis Elevator Company. United Properties is not a party to the action. No claim is being made in this case against United Properties."

The defendant duly excepted to the additional instructions setting out the

grounds therefor. The jury returned a verdict in favor of the plaintiff for $6,-500.00, pursuant to which the court entered judgment. Thereupon, defendant moved for judgment notwithstanding the verdict or in the alternative for a new trial, which motions were denied.

Defendant seeks reversal of the judgment on substantially the following grounds: (1) The court erred in denying defendant's motion interposed at the close of all the evidence for a directed verdict, (2) the court erred in permitting witness Cartier to give expert testimony not supported by competent evidence in the record, and (3) the court erred in instructing the jury, in answer to a question asked by the jury foreman, that there was no controversy about United Properties' position in the case, that no claim was being made in this case against United Properties.

■ In considering the contention that the evidence was insufficient to sustain the verdict, we must view the evidence in a light most favorable to the plaintiff, who was the prevailing party, and plaintiff is entitled to the benefit of all such favorable inferences as may reasonably be drawn from the facts proven. If when so considered there was substantial evidence, as distinguished from a mere scintilla of evidence, then the case presented questions of fact to be determined by the jury, as distinguished from questions of law to be determined by the court.

■ Harry Yager, plaintiff's intestate, was not an employee of defendant, but was employed by United Properties, Inc., owner of the Hamm Building. Defendant had neither ownership, possession, nor control of the elevators. On the other hand, they were owned, operated, and in the exclusive possession of United Properties, Inc. Because of these facts defendant was under no obligation to provide Yager with a reasonably safe place in which to work. That duty devolved upon his employer. As defendant had neither possession nor control of the elevators the mere happening of the accident did not give rise to a presumption

of negligence. Bonfoey v. Haughton Elevator Co., 8 Cir., 227 F.2d 232; Barnes v. Northwest Airlines, Inc., 233 Minn. 410, 47 N.W.2d 180; Northwest Airlines, Inc., v. Rowe, 8 Cir., 226 F.2d 365. As said by us in Bonfoey v. Haughton Elevator Co., supra [227 F.2d 237]:

"The plaintiff was not entitled to the benefit of the res ipsa loquitur doctrine as against Haughton, as res ipsa loquitur can not apply unless it appears, among other things, that the defendant had exclusive control of all the instrumentalities causing the accident."

Defendant's contract for maintenance obligated it to:

" * * * maintain the entire elevator equipment hereinafter described, on the terms and conditions subsequently set forth. We will use trained men directly employed and supervised by us. They will be qualified to keep your equipment properly adjusted, and they will use all reasonable care to maintain the elevators in proper and safe operating condition.

"We will regularly and systematically examine, adjust, lubricate as required * * * ".

The contract also contained the following provision:

"It is agreed that we assume no liability for injuries or damage to persons or property except those directly due to our acts or omissions; and that your responsibility for injuries or damage to persons or property while on or about the elevators referred to is no way affected by this agreement."

■ The evidence as to how this accident happened, being circumstantial, " * * * the circumstances must be proved and not * * * presumed." Chicago, M. & St. P. R. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 566, 70 L.Ed. 1041; Meyers v. Mpls., St. P. & S. S. M. Ry., 168 Minn. 122, 209 N.W. 892.

Sometime after 6:00 p. m. on the date of the accident Yager was on the sixth

floor of the Hamm Building. At that time elevator number three was being operated by a Mr. Sweeney, the regular night operator, while the other elevators were not manned nor in regular use. He descended in elevator number three to the second floor, for what purpose is not disclosed. About 6:30 p. m. he was observed standing in front of the elevators in a crouching position. The car of elevator number two was apparently at the sixth floor and manned by Mr. Tewksbury. He could have descended on elevator number three which was being operated. If he desired to descend on elevator number two he could have signalled, but instead it is assumed by plaintiff that he succeeded in unlocking the elevator at the second floor, that he walked into the shaft and fell to the bottom. This assumption by plaintiff is based on the fact that his body was later found at the bottom of shaft number two and he had last been seen standing in front of the elevator doors at the second floor, and the key for unlocking the door on elevator number two was found near his body.

■ As has been observed, the purpose of the locking device is to provide a means whereby the operator may leave the elevator unattended with the doors closed, and by using the key may unlock and re-enter from the outside. Normally the key will enable one to open the door of the elevator only if the car is present at that floor. There was evidence from a number of presumably disinterested witnesses, some of whom examined the elevators in an official capacity, that the door could not be unlocked unless the car was present. Testimony of state and city inspectors following an inspection immediately after the accident was to the effect that the doors could not be opened when the car was not present, and they found nothing defective, out of order, or not in proper maintenance. As hereinbefore noted, there was much testimony to the same effect. There was testimony of one witness, however, that he had succeeded in opening the door when the car was absent. There was no evidence that the defendant had had any notice of any defect in the locking device. At best, the manner in which Yager met his death is largely dependent upon presumptions and speculation. An inference of negligence cannot be established by a presumption based upon a presumption. Collings v. Northwestern Hospital, 202 Minn. 139, 277 N.W. 910; Henry H. Cross Co. v. Simmons, 8 Cir., 96 F.2d 482; Whitman v. Speckel, 237 Minn. 36, 53 N.W.2d 558; Anderson v. Northern States Power Co., 236 Minn. 196, 52 N. W.2d 434.

Plaintiff produced testimony to the effect that possibly some dirt or dust got into the interlocking mechanism of the elevator doors of elevator number two on the second floor and hence Mr. Yager was able to open the doors when the elevator was not at the second floor, that possibly the interlocking mechanism was not properly lubricated which might have brought about a condition that would have enabled decedent to open the doors when the elevator was not at the floor. This evidence is without probative force, however, because there was no evidence that dust, dirt, or debris was in the interlocking mechanism. Neither was there testimony in the record that the interlocking mechanism lacked lubrication.

■■ Defendant was not an insurer of the mechanisms involved nor of the safety of their use. All that was required of it was the exercise of reasonable care and it appears without dispute that defendant systematically inspected the entire mechanism involved. It sent an inspector to the Hamm Building once a week to ascertain if they had had any particular trouble, and if so, he remedied the trouble. He also checked the machine room in the penthouse and checked and cleaned the pits and did the greasing and oiling where necessary. Defendant also had a man make semi-annual inspections of the elevators. The interlock mechanism and parking device were lubricated annually, and the dust was cleaned out of the shafts annually. In

cleaning the dust and dirt from the shafts defendant used a crew of men to do the work. They started from the top and worked down one hatchway at a time, using vacuum cleaners, rags, and containers in doing the work. In addition to the foregoing, these elevators were annually inspected by the city elevator inspector for the City of St. Paul, and these inspections had been regularly made since 1947. This undisputed evidence convincingly shows that defendant exercised a high degree of care in discharge of its duty to inspect and maintain these elevators and the mechanism employed in their operation.

If there was any defect in the locking mechanism in the second elevator door on the second floor, it was a latent defect which had not been discovered and which, manifestly, was not discoverable by the exercise of ordinary care. Various tests and inspections by experts were systematically made from time to time but these failed to disclose any defect and there never had been any complaint or suggestion that the mechanism was not operating properly. The defect, if any, was a latent one and one is not chargeable with negligence for failing to discover and remedy a defect which is not discoverable by the exercise of ordinary care. Lowden v. Hanson, 8 Cir., 134 F.2d 348; Brown v. United States, D.C.N.M., 122 F.Supp. 166; McVicar v. W. R. Arthur & Co., Mo., 312 S.W.2d 805, 65 A.L.R.2d 785. On this phase of the case we conclude that the defendant fully discharged its duties under its contract of maintenance and hence was guilty of no actionable negligence. Bonfoey v. Haughton Elevator Co., supra.

■ As additional grounds for reversal defendant urges that Yager was guilty of such negligence as to preclude recovery. As Yager was dead prior to the trial there was a presumption that he had used due care for his own safety. This presumption, however, like other presumptions, cannot be weighed in the balance against established facts, and where undisputed evidence is received the presumption vanishes. Faber v.

Herdliska, 194 Minn. 321, 260 N.W. 500; Cosgrove v. McGonagle, 196 Minn. 6, 264 N.W. 134; Dealer's Transport Co. v. Werner Transp. Co., 8 Cir., 203 F.2d 549.

■ Yager had been employed as a night janitor and maintenance man and used the elevators in carrying out his work in the Hamm Building for over two years prior to the accident resulting in his death. On the evening in controversy he first appears upon the scene on the sixth floor. From there he descended in elevator number three which was being regularly operated by the night operator. Why he got off on the second floor does not appear. According to the record, elevator number one was for his use, and elevator number two was assigned to Mr. Tewksbury. Just where he desired to go from the second floor is purely speculative. Neither is there any evidence indicating why he desired to use elevator number two. This elevator was assigned to Supervisor Tewksbury, while number one was assigned to Yager, and confessedly he could with safety have reached any of the floors by using elevator number three which was then being operated by the regular night operator. If he desired to use elevator number two he could have signalled for the car, which at the time was in fact at rest on floor six, manned by Supervisor Tewksbury. Instead of pursuing either of these courses, it is the theory of the plaintiff that he in some manner opened the door of the number two elevator on the second floor and walked into the open shaft. The hallway was lighted and, as has been observed, there was a warning sign in large letters right at the keyhole which he could not have avoided seeing if indeed he used the key. This warning sign was an extra precautionary measure. It read, "Warning—Be sure car is here before entering." The shaft was presumably dark but if not dark, the fact that the car was not present would be plainly visible. In any event, if plaintiff's theory is correct, he walked into the open shaft. These facts and attending circumstances establish as a matter of law, we think, that Yager was guilty of negligence pre-

cluding recovery for his death. In Murray v. Albert Lea Home Investment Co., 202 Minn. 62, 277 N.W. 424, 426, the Supreme Court of Minnesota held the plaintiff guilty of contributory negligence as a matter of law in opening further partially open elevator doors and stepping into the shaft believing the elevator was at the floor. In the course of a well considered opinion it is, among other things, said:

"With knowledge of all of these facts plaintiff pushed the door open and blindly walked into a dark shaft without making the least investigation to ascertain whether the elevator car was at that floor. Would a reasonably prudent person, possessing the knowledge at plaintiff's command, have acted in that manner? We do not believe so."

It is urged that the court erred in overruling defendant's objections to the testimony of plaintiff's expert witness and it is also urged that the court erred in its additional instruction to the jury after the jury had requested further instructions. These are procedural matters which, if defendant's objections should be sustained by us, would simply entitle defendant to a new trial. In view of our conclusion that the defendant was entitled to a directed verdict in its favor, a consideration of these questions would unduly extend this opinion and serve no useful purpose.

The judgment appealed from is therefore reversed and the cause remanded to the trial court with directions to dismiss the action.

JOHNSEN, Circuit Judge (dissenting).

I think the evidence here was sufficient to entitle the trial court to submit the questions of proximate cause, negligence and contributory negligence to the jury.

As to proximate cause, the circumstances would rationally support the inference that Yager's death was due to his falling into the pit, from having entered the shaft on the second floor, through the doors of elevator No. 2. Indeed, it seems to me that this is the only explanation to which the existing circumstances can be said reasonably to point, on how the accident occurred.

There is testimony in the record showing that, some three or four minutes before the noise of his fall into the pit was heard, Yager had had the operator of elevator No. 3 take him from the sixth floor to the second floor of the building. He ostensibly had completed his toilet-cleaning work on the sixth floor, since he had brought his cart or truck, on which he carried his supplies and utensils, into the elevator hallway with him. His foreman, who saw him waiting in front of elevator No. 3, gave this purported explanation of his actions: "Going by other days of his routine, he would go down, get his elevator No. 1, bring it up to the sixth floor and put his cart on it and work his way down the floors".

This meant going to the second floor, since this was the place where elevators Nos. 1, 2, and 4 were required to be parked or stationed, when they were not in use, and was the only point where provision had been made for enabling the doors to be opened in access to them. While the foreman tried to convey the impression that it was Yager's duty to use elevator No. 1, and not elevators Nos. 2 and 4, there was evidence from which the jury could find that this was not an ironclad rule but a matter of flexible convenience, as the elevators were available. Thus, his testimony contains this statement: "It was customary and part of the duties of the employees such as Harry Yager to use these elevators in pursuance of their work, and that had been going on since he had been employed there". And other evidence showed that the employee who was directed to finish Yager's work, after the accident, had taken and used elevator No. 2 for that purpose, just as Yager apparently had intended to do.

After Yager had gotten out of elevator No. 3 on the second floor, he was standing by the elevator shaft, with his head bent, "as if he was listening". The charwoman, who observed him, was at

the time entering one of the offices on the floor but came back into the hallway some seconds later, by which time Yager had disappeared. About that time, the operator of elevator No. 3 heard a noise from the shaft—"something   *   *   * along the unusual side". Shortly thereafter, Yager's foreman signalled for elevator No. 3 to come to the second floor and, according to the operator, he said: "We are going down in the basement to investigate. I think somebody has fallen in the shaft, or something". The operator added, "He might have said 'Harry fell down' * * * ".

Yager was found by the foreman and the operator lying prostrate in the pit of elevator No. 2, with the key or rod beside him which was kept on the second floor for use in opening the doors, to obtain access to the elevators when they were stationed there. The pit itself contained a door or meshed gate in front of it, which was locked, and to which Yager had no key.

The doors and shafts on the second floor, for elevators Nos. 1, 2 and 4, (which, as indicated, was the only place where provision was made for gaining access to them from the outside) contained an interlock and parking device for the elevator, which was supposed to make it impossible for the key or rod to open the elevator doors more than three or four inches, unless the elevator was located at the floor. By the admission of appellant's experts, "If that door opened on the second floor without the elevator being there, there was something wrong with the interlock".

It is true that appellant's witnesses—which included some outside persons as well as its own mechanical experts—all testified that they had not been able, after the accident, to make the doors of the shaft come open, except when the elevator was at the floor, and that the mechanical parts of the interlock and parking device were found to be in perfect working order when examined.

But against this, in addition to the circumstances of the accident, there was testimony on the part of the day foreman of the building that on the morning following the accident, after elevator No. 2 had been put into passenger service and had left the second floor, he had undertaken to use the key and had been able to open the door of the shaft with it. He stated that he reported this fact to the building manager's office; and there is no refutation contained in the evidence as to such a report having been made by him.

On what I have set out, it seems to me that it would be competent for a jury to find that the accident had occurred from Yager's being able to open the door into shaft No. 2, without the elevator being there. In fact, as I have suggested, this impresses as being the only rational explanation which can be made of the accident; and neither the evidence nor the argument of appellant attempts to offer any other.

So much, then, for the question of proximate cause in general. Its more specific relationship will be made to appear in the discussion of the question of negligence following.

As to negligence, it was appellee's theory that appellant had not exercised the necessary care to keep the mechanism of the parking device properly oiled and free from dust and lint, and that as a result, on the occasion of the accident, a rod in the mechanism, which depended upon a dropping of it being made to occur by gravity into blocking or checking position, had not fully functioned.

Appellant's contract obligated it to "use all reasonable care to maintain the elevators in proper and safe condition"; to "periodically examine all safety devices"; and to "lubricate and adjust * * * all accessory equipment".

It was admitted that the interlock and parking device had not been oiled and cleaned for over a year. Appellant claimed, however, that it was not necessary to do these things more than once a year, in order to keep the devices in proper working order. On the other hand, an engineer witness for appellee testified that, in order to make certain

that the gravity functioning of the rod in the parking device would not be interfered with from a drying out of its oil or the accumulating of dust and lint in its mechanism, there should be both an oiling and a cleaning of the device every six months at least.

In the jury's appraisal of these conflicting expert opinions, there were statements contained in the cross-examination of appellant's experts to which the jury may well have given sidelight consideration. I quote some of them as related to both oiling and cleaning.

"They clean and oil the parking device to make sure it works properly. If it is never oiled, probably some day it would not work properly." "Oil does dry out, and the purpose of reoiling is to restore the oil to the original condition and permit these parts to work the right way." "With respect to this locking or parking device, if any of these four joints bind enough to keep that rod up, you can open that door. For the rod to function those four joints must be free enough to allow that rod to drop." As to dirt and lint— "It would have to be quite a little bit of lint or something else that could slip through there that would gradually accumulate that would prevent that (rod) from going down all the way."

According to the evidence, the housing on the gravity-rod device contained a slot, through which it would be possible for dust and lint cumulatively to sift and become deposited. Beyond such accumulation as would normally thus occur through the course of over a year in the elevator shaft of a downtown office building, there was entitled to be taken into account the further fact that the parking-device mechanism on the second floor had on that very day been subjected to such special stirring up and dropping of lint and dust as could be occasioned by a general vacuuming and cleaning of the shaft from the top floor of the building down to and including the third floor. Appellant's crew had that evening ceased its activities at the third floor, intending to go on with a cleaning of the shaft and the mechanisms at the second floor the following morning.

Since, as I have stated, the accident was capable, on its existing circumstances, of being rationally accounted for or explained only on the basis that the decedent had been able to open the elevator door on the second floor with the key to the locking and parking device, and since, according to the evidence, he would not have been able to do so if the gravity rod had functioned properly so as to have dropped into regular blocking or checking position, I think the jury could reasonably conclude and find that the gravity rod had failed to properly function and operate on the occasion of the accident, as well as at the time of the experiment in which the day foreman engaged on the morning following. And in the light of the evidence which I have set out, as well as on the basis of the common experience which most men would have as to such a simple mechanical principle and operation as was involved in the gravity-rod device, it seems to me that the jury could further regard it as being naturally probable that the oiling and dust-accumulation situation had been responsible for or had contributed to the failure of the rod to have dropped into full blocking or checking position. Whether the sticking or nondropping of the gravity rod from these elements was of such chance occurrence (it might perhaps correct itself entirely on a subsequent lifting or manipulation) as to make what appellant had done or failed to do in relation to the factors of oiling and dust-accumulation constitute lack of due care or negligence under all the circumstances and in relation to the conflicting expert testimony would in my judgment be a question for the jury.

As to contributory negligence, I think that this question too was necessarily for the jury. As against the fact that the door had been able to be opened and that the decedent would have the right to believe that this could not occur unless the elevator was at the floor, I do not believe that the general sign, "Warning —Be Sure Car Is Here Before Entering",

would require, as a matter of ordinary human conduct, that he be held to have been guilty of contributory negligence as a matter of law. The evaluation of that question—and particularly in its relation to the presumption of care attendant upon his death—would seem to me clearly to be for the jury. This is true also as to any other arguable elements in the situation.

I think the judgment is entitled to be affirmed.