HEDWIG S. COSGROVE v. LEE McGONAGLE.[1]

December 20, 1935.

No. 30,449.

[1]Reported in 264 N. W. 134.

*Mitchell, Gillette, Nye & Harries,* for appellant.
*Courtney & Courtney,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant appeals from an order denying his blended motion for judgment notwithstanding the verdict or a new trial. For decision here is the question of whether the evidence sustains the verdict. Determination thereof requires a rather exhaustive *résumé* of the facts appearing in the record.

Plaintiff, 45 years of age, well educated, and a teacher of many years' experience in her chosen field, was engaged in that capacity in one of the public schools of Duluth. Her school work was to begin September 5, 1933, the day following the unfortunate accident to which we shall now direct our attention. Her daughter Catherine, 21 years old, a graduate of our state university, was with plaintiff, occupying the rear seat in defendant's Ford automobile. They were gratuitous passengers, having been invited by defendant and his mother, Grace Farmer McGonagle, his guardian *ad litem* here, to go with them on a trip to Chicago to attend the Century of Progress World's Fair. On their way home to Duluth from Chicago, Labor Day, September 4, 1933, they met with the accident out of which the present case arose, near Black River Falls, Wisconsin. The highway is of concrete, 20 feet wide, with shoulders

approximately 10 feet in width on each side. There was considerable traffic, something like 200 cars per hour. The day had been rainy. As a consequence the pavement was wet, likewise the shoulders, but the latter were not soft. As they were thus proceeding homeward defendant drove at a rate of 40 to 45 miles per hour. He kept well within and upon his side of the concrete highway, the traffic lanes being clearly marked with a heavy black stripe in the center of the pavement. The accident occurred about four o'clock in the afternoon and came about in this fashion: As they were thus proceeding upon their journey they observed a string of automobiles, some three or four in number, approaching from the north. These automobiles came along at a fair rate of speed but not indicating danger. When a short distance away from (estimated at from 100 to 300 feet) these approaching automobiles, the third in line thereof, a Peerless car driven by one Theodore Cienki, suddenly turned out of line as if to pass the cars in front. Plaintiff, in a statement given by her to an employe of defendant's counsel the second day after the accident, described the situation fully and accurately. She therein said, speaking of what happened:

"Lee [defendant] was driving on his right-hand half of the pavement and I judge at the rate of about 40 miles an hour. At this time there were at least four cars in line coming towards us. I would say that when we were from 100 to 200 ft. away a car suddenly turned out of the line of approaching cars. That car was, I thought, the third one, there were two ahead of it. That car that turned out of line suddenly headed right out to its left on to our right shoulder just like the driver had lost control and it was traveling terribly fast. * * * As I recall it our car was entirely off the concrete when struck, it was away over to the edge of the bank. There was an awful impact between the two machines and our car went into the ditch and turned over."

Her daughter Catherine two days later made a similar statement, having gone to the office of defendant's counsel to make the same at the request of Mr. Whitney, the man who had taken plaintiff's statement.

At time of trial plaintiff to some extent repudiated her written statement, claiming that she had no recollection of what happened after she saw the Peerless car come out of line. But her daughter, also called as a witness in her behalf, did not question the accuracy of the statement she had made except the last paragraph thereof, which reads: "There was not a thing that Lee could have done to prevent this collision. I do not blame him at all nor can I see how he could have possibly avoided this accident." As to that paragraph, she testified: "Q. You deny that part of the statement? A. Yes, sir, *because I don't know.*" (Italics ours.)

At the trial plaintiff was thoroughly cross-examined by defendant's counsel. When confronted with her written statement, particularly that portion thereof relating to defendant's manner of driving and the emergency created by the sudden appearance of the Peerless car in front of defendant's line of travel, most of the questions asked were answered by the stereotyped form of, "I don't remember," or "I don't know." The following is a fair sample:

Q. "Did you make this statement,—and listen carefully to this: 'I do not blame Lee for this accident; he was not at fault, and the only one to blame is the driver of the car that ran into us'?

A. "I don't remember of making that statement.

Q. "You deny making that statement?

A. "Why, I think I do. * * *

Q. "And did you make this further statement: 'Lee did not have a chance to avoid this accident, he did just what I think was right and proper'?

A. "I don't remember."

The written statements of plaintiff and her daughter harmonize with and are fully corroborated by the testimony of other witnesses. Mr. Christianson, a witness called by plaintiff, testified that he had parked his car on the west shoulder of this highway at a point about 300 feet from where the Peerless and defendant's Ford collided. He observed a line of three cars coming toward him from the north, the Peerless being third in line. At this point and for a considerable distance both to the north and south thereof the

10

road was straight and level. The witness was at this point to take a census of traffic. It is therefore obvious that it was his business to watch cars as the same passed him. He observed the Peerless car turn out of its line of traffic as if to pass the two cars ahead of it. Defendant's car was near at hand, and both crowded toward the easterly edge of the pavement. When the Peerless turned out of line to pass the cars in front, the Ford immediately turned to its right and headed for the ditch. He testified that the Peerless struck the Ford immediately back of the driver's seat and that both cars were in motion at the time of impact, the Peerless, however, stopping at the dirt bank, whereas the Ford rolled over and into the ditch some 12 feet from the pavement.

Mrs. McGonagle, defendant's mother, who sat in the front seat with him at his right, also testifying for plaintiff, said that her son had been traveling between 43 and 45 miles per hour immediately prior thereto and that she had cautioned him that he was going "pretty fast" because of the wet pavement and suggested that he slow down. He remarked that he did not think he was going too fast. She saw a car turn out of line and come over to their side of the pavement, and the next thing she remembers is that there was a collision. She said that this other car ran into the Ford while her son's car was headed for the ditch.

Mr. Brandeau, in an affidavit made while he was at a hospital and read into the record pursuant to stipulation of counsel, affirms that he was driving upon this highway at the time of collision. Shortly before the collision occurred he observed from his mirror that a car was approaching from the rear and that it crept up until it was about a car length behind him. He, affiant, was traveling at a rate of about 35 or 40 miles per hour at the time this car came from behind. The car so overtaking him was traveling faster. Just as the car from behind was about a car length behind he observed a parked car on the west shoulder of the road about a block to the south. At this point a car was approaching from the south, as he thought, at a rate of about 35 or 40 miles per hour. Affiant slowed down because his brakes were not in good condition to make a quick stop, and he did not know what the driver of the

parked car toward his right intended to do. As he slowed down the car behind him sounded its horn, and when he looked into the mirror saw it go forward on his left side. He looked ahead for the car coming northerly and observed that it was so close that "something was going to happen." When he again looked the car beside him had slackened up a little as if to get into line, but the two cars crashed while both were in motion at a point opposite the back end of his car. He heard the crash, looked back, and saw the Ford turn over and go into the ditch.

Judge Perry of the county court of Jackson county, Wisconsin, testifying for defendant, said that on the day in question he was employed by defendant to investigate the collision. He came upon the scene within half an hour after it happened. The cars had not been moved. He traced the tracks made by the Ford from the time it swerved from the pavement and over onto the easterly shoulder of the road, and by tracing these tracks it was obvious to him that a distance of 75 to 100 feet was so traversed. The right front wheel of the Ford was approximately two and one-half feet off the pavement at the point of collision. The Peerless was at the edge of the pavement and over on the east shoulder. He was personally present when the various pictures were taken, later introduced in evidence at the trial.

Defendant himself testified that he was traveling 40 to 45 miles per hour immediately before the accident. He observed three or more cars approaching him from the north, but all appeared to be traveling upon and within their own lane of travel. When about 200 feet away from the approaching cars, he observed one of the approaching cars, the third in line, suddenly swerve into defendant's lane of traffic. They were so close that he deemed it essential, to avoid a head-on collision, to steer for the ditch, and this he accordingly proceeded to do. He did not apply his emergency brakes for fear that the wet pavement might cause his car to slue, but as soon as the wheels on his right-hand side struck the shoulder he applied the brakes gradually. While so seeking to strike the ditch he was struck by the Peerless, the impact taking place immediately behind his (driver's) seat.

It is obvious from what has been stated that thus far plaintiff has not made a case. The only testimony upon which she may place any hope of reliance is that furnished by the driver of the Peerless car and that of his brother who rode with him. The driver's testimony (in the form of deposition) is to the effect that just before the collision he was trailing another car going in the same direction. This car suddenly stopped when he was only about ten feet behind it, and he was compelled suddenly to turn his car to the left to avoid hitting the car in front or going into the ditch to his right. He claims that the Ford was then about 300 feet away. He judged its speed to be from 50 to 55 miles per hour. He claims that he steered his car over and onto the left shoulder of the highway and had brought it to a complete stop before the impact occurred. On cross-examination he said that he had been trailing the other car over a distance of about a mile and during all of that time was only about ten feet behind, the rate of travel being approximately 30 miles per hour. He stated that his reason for swinging into the northbound lane of traffic and onto the shoulder was to afford the approaching car space between the car to his right and his own. He also claims that his car remained stationary about a minute before the impact took place. His brother testified to substantially the same thing except that he thought the Ford was approaching at a rate of about 45 miles per hour.

This in sum and substance is the testimony in the case. If the testimony of the driver of the Peerless car and that of his brother is worthy of credence in face of all the other testimony in the case, then clearly there was a jury question involved. Necessarily we cannot take in hand the determination of fact issues. We cannot count witnesses nor weigh their testimony. But we are governed by what is obvious to an unprejudiced mind sitting in judgment. If the physical or demonstrable facts are such as to negate the truthfulness or reliability of the testimony of the Peerless driver and that of his brother, then clearly the verdict is without foundation and must be set aside. "Facts, proved to the point of demonstration, control as against mere declarations of witnesses." E. C. Vogt, Inc. v. Ganley Bros. Co. 185 Minn. 442, 444, 242 N. W. 338,

339; 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) §§ 9764, 10344; 28 R. C. L. 661. See also 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 7160a.

If it be true that the Peerless car had stopped and remained in that position about a minute, and if it also be true that the Ford was approaching at a rate of 50 to 55 miles per hour, it is obvious that defendant during that time would have traversed a distance of more than 4,000 feet. A simple problem of computation proves this testimony utterly worthless. By watch test he estimated the time to be 10 seconds. If that be accepted as true, defendant's car must have traveled at least 700 feet, the rate of speed at 50 miles per hour being approximately 73 feet per second. Here, too, we find the same difficulty. The weight of this testimony is thus utterly destroyed. We cannot throw overboard the overwhelming weight of the evidence adduced in defendant's behalf and accept a version so utterly lacking in probative force as that provided in plaintiff's behalf. Rather, it seems clear that this entire difficulty arose from the fact that the Peerless driver suddenly swerved out of his traffic lane at a point where he did not have the opportunity of seeing what was approaching from the other direction. He had no business so doing. Thereby, as a matter of common knowledge of every automobile driver, hazards are created likely to lead to disastrous results. It seems very clear that the accident occurred because, and only because, of the negligence of the driver of the Peerless car. He, and he alone, created the emergency that brought about the disaster. In such situation the law is that "one, suddenly confronted by a peril, through no fault of his own, who in the attempt to escape does not choose the best or safest way, should not be held negligent because of such choice unless it was so hazardous that the ordinarily prudent person would not have made it under similar conditions." Johnson v. Townsend, 195 Minn. 107, 110, 261 N. W. 859, 861.

It is the law of Wisconsin that the duty which the driver of an automobile owes to another riding with him as a guest is only that of licensor to licensee. Sommerfield v. Flury, 198 Wis. 163, 168, 223 N. W. 408. That might present a serious question from plaintiff's

standpoint were we called upon to consider it. We are not because of our conclusion that plaintiff did not make an issue for the jury on the question of negligence.

The effect of the statute, L. 1929, c. 289, § 4, 3 Mason Minn. St. 1934 Supp. § 5687-8, making "any statement secured from an injured person at any time within 30 days after such injuries were sustained * * * presumably fraudulent for use in the trial of any action for damages for injuries sustained by such person or for the death of such person," has not been overlooked. A presumption only is created thereby. "When undisputed credible evidence is received, the presumption vanishes. It does not remain to create an issue of fact as against such evidence." Faber v. Herdliska, 194 Minn. 321, 323, 260 N. W. 500, 501, and authorities cited therein. See also 1 Jones, Evidence (2 ed.) § 30, p. 57, et seq., and cases cited under notes. The presumption in the instant case has been met and clearly overcome by defendant.

It therefore necessarily follows that the order must be reversed and the lower court instructed to order judgment for defendant notwithstanding the verdict.

So ordered.

HILTON, JUSTICE (dissenting).

I dissent. There is no question but that there was a dispute in the evidence on material facts. In the majority opinion it is frankly conceded that:

"If the testimony of the driver of the Peerless car and that of his brother is worthy of credence in face of all the other testimony in the case, then clearly there was a jury question involved. Necessarily we cannot take in hand the determination of fact issues. We cannot count witnesses nor weigh their testimony. But we are governed by what is obvious to an unprejudiced mind sitting in judgment."

It will be conceded that unprejudiced minds have determined the result of this appeal, but no one would intimate that the learned trial court was other than unprejudiced. That court thought and ruled that there was a fact issue for the jury and so submitted the

case. The lower court had ample opportunity to observe most of the witnesses (some of the testimony was taken by deposition), to watch their demeanor on the stand and their manner of testifying, while we have before us only the cold record. That court was in a much better position than we are to determine the credence to be given. We should not wipe out the testimony of the occupants of the Peerless car merely because there was strong evidence to the contrary.

I am constrained to comment upon the statute, referred to in the majority opinion, making "any statement secured from an injured person at any time within 30 days after such injuries were sustained * * * presumably fraudulent for use in the trial of any action for damages for injuries sustained by such person or for the death of such person." It is well known that reprehensible practices in the past gave occasion for that enactment. At the time plaintiff made the statement in question she was confined to a dark room in her home. It was two days after the accident. She was still suffering from the effects of a long trip in an ambulance, *i. e.,* from Black River Falls to Duluth *via* Minneapolis, a distance of well over 400 miles. Plaintiff was unable at the time to recognize the party (Mr. Whitney) taking the statement, who incidently had had 20 years' experience in like work. In the accident plaintiff had suffered great shock; she had received severe cuts and lacerations; two ribs were broken; her face disfigured; one of her eyes was swollen until it was practically closed, and she was under the influence of an opiate given to lessen her pain. Mr. Whitney told her that the statement was being taken in order to help the plaintiff and the defendant's mother.

It is true that when "undisputed credible evidence is received, the presumption vanishes." However, there is absolutely no evidence in this case to rebut the testimony of plaintiff as to the conditions under which the statement was taken. There is evidence that some of the recitals appearing therein were true, but that does not rebut the stigma of fraud attached to the obtaining of the statement. It is the taking of these statements at a time when the victim is in no condition to give such statements which the statute intended to

 16

guard against. I feel that the laudatory purpose of the statute is being nullified by the decision in this case. Plaintiff on cross-examination did give "stereotyped answers" such as "I don't know" or "I don't remember" in response to queries as to whether she answered as was claimed in the purported statement. She could hardly do otherwise. One in the physical condition that she was at the time the statement was taken "would not know" and "would not remember" what was said.

LORING, JUSTICE, took no part in the consideration or decision of this case.

