# JOHN SHASTID v. CALVIN SHUE AND OTHERS.

77 N. W. (2d) 273.

May 18, 1956—Nos. 36,608, 36,609.

316

*Robins, Davis & Lyons* and *Richard Converse,* for appellants Calvin Shue and National Reefer Service, Inc.

*Sexton, Tyrrell & Jardine,* for appellants Farmers Union Federated Co-op Shipping Association and Robert J. Williamson.

*Rosengren, Rufer & Blatti* and *Johnson, Sands & Brumfield,* for respondent.

NELSON, JUSTICE.

Appeals from two separate orders denying motions by two sets of defendants for judgment notwithstanding the verdict or a new trial.

This action grows out of the collision of plaintiff's tractor-trailer unit with the rear end of another tractor-trailer unit which was parked on the concrete pavement directly behind still another tractor-trailer unit which was disabled. All three units were headed in the same direction. Plaintiff, the owner and driver of a tractor en route from Winnipeg to Arkansas with a trailer loaded with 15 tons of eggs, was proceeding easterly on Highway No. 10. At a point about one mile east of the village of Bluffton, Minnesota, or about four miles west of Wadena, he collided with the rear end of a tractor-trailer unit operated by defendant Williamson. The latter unit, owned by the defendant Farmers Union Federated Co-op Shipping Association, was parked in its driving lane on the concrete pavement directly behind a disabled third unit driven by defendant

Shue. Defendant Shue, who owned his tractor, was hauling defendant Seath's trailer which was used to transport property of the defendant National Reefer Service, Inc. For convenience herein we shall refer to the disabled unit which was parked first in line on the pavement as the Shue unit; the second parked vehicle, not a disabled unit, will be designated as the Williamson unit; and plaintiff's approaching vehicle will be referred to as the Shastid unit or simply as the plaintiff.

The accident occurred about midnight on January 21, 1954. Highway No. 10, at the locus of the accident, consists of a 22-foot wide concrete pavement flanked on each side with a tarvia-surfaced shoulder 7½ feet wide. It was a clear, bright night. The pavement was free of ice and in excellent condition for travel. Likewise, the tarvia road shoulders were in excellent condition for use. Although the night was clear, the atmospheric conditions were not ordinary. The night was bitterly cold with a 40-degree below zero temperature. Travel on highways naturally became more difficult under those conditions. Shue had been having engine trouble because the congealing of the fuel in the fuel line restricted the flow of the gas to the carburetor. At a point approximately one-half mile east of the foot of a slight incline, and from 1,000 to 1,300 feet west of the crest of the same incline, or about one mile east of Bluffton, Shue's engine stopped abruptly with the result that his unit was left standing on the pavement directly in the middle of the eastbound traffic lane. As he came to a stop, he saw in his rearview mirror the Williamson unit approaching from behind. He immediately blinked his lights on and off as a signal to Williamson. The latter heeded the signal and brought his unit to a halt five or six feet directly behind the Shue unit. In other words, both vehicles were then standing still, tandem fashion, in the center of the eastbound traffic lane. As soon as Williamson stopped, Shue, without first attempting to set out flares, ran back to Williamson to ask for a push to Wadena or a push onto the shoulder of the road. As he jumped up on Williamson's running board he heard a noise and looked around to the rear where he saw Shastid's unit approaching.

Shue testified that Williamson immediately began working his traffic signals and that they were in fact working. The Shastid unit continued to approach at a speed of about 40 to 45 miles per hour.

Plaintiff testified that he did not at any time see any lights on the rear end of the Williamson unit. The rear of the Williamson unit was a dirty gray color so as to blend into the color of the concrete pavement. Photographs submitted in evidence show a dark-colored undercarriage on the Williamson unit, but apparently the appearance of the rear of the trailer in the middle of the night would not be significantly changed by the black undercarriage. There was snow on the back of the truck. Plaintiff testified that the Shue and Williamson units, which were stopped on the incline, backgrounded against the concrete highway and did not produce a silhouette, visible to him, against the sky. This may to some extent be at odds with the physical possibilities and of course conflicts with the views contended for by defendants. Both Shue and Williamson testified that the lights were burning on the Williamson unit, but there is no testimony that either, immediately before the collision, had viewed the Williamson trailer directly from the rear. The trailer bodies were both about 8 feet wide and about 12 feet high and therefore the Williamson trailer concealed the rear lights of the Shue unit. In addition to plaintiff's testimony that there were no "lights showing or displayed on the back of that trailer" visible to him, plaintiff further testified that there were "no flares or fuses or signals of any kind" visible to him while moving toward the stalled vehicles. Because of the 40-degree below zero temperature, there were certain mechanical disabilities in the units involved in the accident, including a frozen or near-frozen fifth wheel on the Shastid unit.

Plaintiff testified that as he approached defendants' trailers, for the last 250 feet or more, he was watching "right down the road" but that they did not come into view until he was within 75 feet, and immediately prior to the collision, while he was driving his unit at a speed of about 40 miles per hour. He had placed his lights on low beam when he passed an approaching car shortly before the

accident. He had kept the lights on low beam because he thought another car was approaching. While proceeding up the slight upgrade, plaintiff admits that with his lights on dim he could easily distinguish objects—such as mailboxes—up to a distance of 250 or 300 feet ahead. Despite such unimpeded vision for at least 250 feet, plaintiff testified that he proceeded along his traffic lane without the Williamson unit becoming visible to him until it was only 75 feet away. According to his own testimony, he traveled another 40 or 45 feet before he reacted by attempting to apply the brakes and to turn to the left. In the remaining 30 feet he turned about four feet to the left with the result that the right front of his tractor struck the Williamson unit and drove the same against the Shue unit. Apparently plaintiff's brakes did not take hold until approximately the moment of the impact.

The testimony of the state highway patrolman, who was called to the scene of the accident shortly after its occurrence, to some extent corroborated plaintiff's claim that the trailer and highway were of a color that might cause them to blend. He testified:

"Q. And tell us if you can how that color of that trailer compared with respect to the color of the concrete highway there?

"A. Well, aluminum when it is new is bright and shiny but as it is used it darkens and it takes on a gray color and the highway, of course, is gray, the concrete highway."

The testimony of a Wadena police officer, who was at the scene of the accident shortly after its occurrence, was to the same effect. He testified as follows:

"Q. How did it [the trailer] compare with the color of the concrete there, Mr. Warwick?

"A. Well, it would be somewhat of the same color, I would say, in the condition that it was in."

There is also support for this contention in the testimony of the defendant Shue that with the snow on his truck it was just about the color of the highway. Likewise, photographs submitted in evidence show a dark-colored undercarriage on the Williamson trailer

and the usual highway discoloration which matches the approximate parking alignment at the time of the accident.

In view of such evidence it would seem that whether the Williamson trailer was silhouetted against the sky, taking into account the manner of the tandem parking of the two tractor-trailers with their forward lights on, or whether it was obscured within the color of the concrete highway or through a blending with it, so as to excuse plaintiff's failure to observe it sooner, were questions for the jury's determination.

The accident occurred about a quarter of a mile before the crest of a moderate three-quarter-mile incline. The record is silent as to the topography of fluctuation of the incline. There is nothing to indicate that it was wholly of an even plane to the extent the defendants suggest. It is often true that highways appearing even and level may actually undulate to an extent almost inperceptible to the eye. Such variations may result in material and sometimes substantial differences in the appearance of vehicles traveling or parked thereon as they fall within the range of the headlights of other vehicles approaching them. Whether such was the situation here and, if so, whether it might further excuse plaintiff's failure to observe the trailer sooner seem likewise proper issues for a jury's determination.

With reference to reflectorized warning signals on the Williamson trailer, we feel that there also a jury issue was indicated. Plaintiff testified that his view was directly forward; that he had good vision; and that he saw no lights either operating or displayed upon the trailer. Photographs taken immediately after the accident indicate that the rear of the Williamson trailer, including its rear lights, was partially covered with snow and dirt. It seems clear therefrom that a jury may have properly concluded that the position and condition of the required reflectors were such as to render them ineffective as warning signals and thus further excuse plaintiff's failure to observe the trailer until almost upon it.

■ We have frequently held that distractions occasioned by the lights of approaching vehicles or other objects on the highway may

constitute circumstances which, a jury might find, excused a driver's failure to observe a car on the highway before him. Johnson v. Kutches, 205 Minn. 383, 285 N. W. 881; Brown v. Raymond Bros. Motor Transp. Inc. 186 Minn. 321, 243 N. W. 112. It is true that plaintiff here admitted he could see mailboxes, houses, trees, poles, and like objects located to the sides of the highway for a distance of 250 to 300 feet, but his ability to do this would not seem to lead to an absolute conclusion that the trailer parked on the highway would likewise appear within his view at about the same distance, in view of the evidence that because of its color it may have been so merged and blended with the highway as to become indistinct. Further, plaintiff testified that before the collision he had "just met an automobile or vehicle down the road between the little bridge down there and the scene of the accident"; that he had then switched his lights to dim and was traveling thus at the time of the accident because "up ahead of me it looked to me like lights coming over a grade and I didn't switch them back on bright." Within the principles outlined in the decisions above cited, all such factors would appear to give rise to an issue as to whether there were distracting circumstances present which may have been the cause of plaintiff's failure to sooner observe the trailer.

The Shue unit was stopped on the pavement with the Williamson unit approaching from the rear and finally stopping within six feet of the Shue unit. Both trucks had headlights shining out ahead of the unit. The Williamson headlights conceivably were reflected off the rear of the Shue unit. The shining of the lights could, no doubt in some respects, be seen from the rear. All of these factors could have contributed to the plaintiff's impression that he was merely meeting another vehicle coming from the opposite direction, especially when coupled with the driver's normal expectation of not finding other vehicles stopped dead in the middle of the driving lane. Of course, all of these factors were for the consideration of the jury. As pointed out by the trial court in its instructions to the jury:

"* * * It should not be difficult for you to form a mental picture of the situation and of the events that occurred at the time and place in question. I presume that each and everyone present has upon many occasions met vehicles of this kind as they traverse our highways at all times of the day and night and in all kinds of weather."

■■■ We must view the evidence in the light most favorable to the verdict. We have often said that it is only where evidence of contributory negligence is so clear and conclusive as to leave no room for differences of opinion among reasonable men that a court may enter the province of the jury in determining the issue. Carpenter v. Birkholm, 242 Minn. 379, 65 N. W. (2d) 250; Johnson v. Mancilman, 241 Minn. 461, 63 N. W. (2d) 569; Ryan v. Griffin, 241 Minn. 91, 62 N. W. (2d) 504; Schleuder v. Soltow, 239 Minn. 453, 59 N. W. (2d) 320; Ranum v. Swenson, 220 Minn. 170, 19 N. W. (2d) 327. Likewise, we have held one is not bound at all times or under all circumstances to discover at his peril every obstruction to travel within the range of his headlights. Twa v. Northland Greyhound Lines, Inc. 201 Minn. 234, 275 N. W. 846. The case of Orrvar v. Morgan, 189 Minn. 306, 249 N. W. 42, relied upon by defendants, appears distinguishable under the facts here present. In that case plaintiff testified that he could only see 25 to 40 feet ahead of him with his traveling lights tilted downward. Testimony of a mechanic, however, clearly established that the lights cast a ray sufficient to light the highway for a distance of 150 feet ahead. Plaintiff offered no explanation of his failure to see a truck parked on the highway ahead of him. There was no claim that it blended with the highway or that other distracting circumstances may have excused his observation thereof.

■ The decision of this court in Vogel v. Nash-Finch Co. 196 Minn. 509, 265 N. W. 350, wherein the Orrvar case was distinguished and a verdict in favor of the plaintiff was sustained, appears applicable. There we held that because a jury might find that the driver of the parked car had obscured its taillight from plaintiff's oncoming vehicle, and because the color of the parked car may have caused

it to blend with the highway, the issue of plaintiff's contributory negligence was one for the jury's determination. In Jurgensen v. Schirmer Transp. Co. 242 Minn. 157, 162, 64 N. W. (2d) 530, 534, we limited the Orrvar case as follows:

"* * * We feel that the Orrvar case has been distinguished so often that *it can no longer be considered as an authority except in the limited field covered by its facts.*" (Italics supplied.)

In Orrvar v. Morgan, *supra,* this court reasoned that the driver of plaintiff's car either must not have been maintaining a proper lookout or was traveling so fast that he could not stop within the range of his vision. The evidence in the instant case does not establish either of those conditions conclusively, thus the issue of contributory negligence as well as the issue of negligence was properly left to the jury by the court below.

More recently in Schubitzke v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 156, 160, 69 N. W. (2d) 104, 107, we stated:

"To adopt the 'range of vision' rule as a rigid formula to be applied regardless of the circumstances would be unnecessarily severe as well as impractical in many situations. In accordance with the more recent decisions of this and other courts, * * * the determination in each case should be made on the basis of the underlying concept involved, namely: Did the driver adhere to the standard of care to be expected from a reasonably prudent person under similar circumstances? If, under the particular facts of a given case, the failure to drive within the range of vision does not conclusively constitute a deviation from the standard of care exercised by the ordinarily prudent person, then the driver's failure to operate the vehicle at such a speed should be submitted to the jury merely as evidence bearing on his negligence. To do otherwise would be to apply an arbitrary standard of behavior without regard to surrounding circumstances—a policy which we have expressly denounced."

Because of the evidence above outlined, and in view of the limited application of the Orrvar case, it is somewhat difficult to escape the

conclusion that the issue of plaintiff's contributory negligence was properly one for the jury.

■ In its instructions to the jury, the court stated:

"A sudden emergency exists when the driver of a motor vehicle is suddenly placed in a position of imminent peril, great mental stress, or danger, which situation has not been brought about by his own negligence, but in which instant action is necessary to avoid a threatened danger. A lesser degree of care may then be sufficient, but the driver must use that care which the ordinarily prudent person would exercise under like or similar circumstances. One suddenly confronted with a peril through no fault of his own, who in attempting to escape does not choose the best or safest way should not be held negligent because of such choice, unless it was so hazardous that an ordinarily prudent person would not have made [it] under similar circumstances.

"You may or may not find that an emergency presented itself in this case, but if you should find that there was an emergency and that it was caused by the negligent act or omission of one of the parties, then that party could not claim the benefit of the emergency rule that I have just explained to you, because the rule applies to a situation not brought about by the negligence of the individual seeking the benefit of the rule."

Defendants assign as error that portion of the above instruction to the effect that: "A lesser degree of care may then be sufficient * * *." They concede that the remainder of the instructions constitute a correct statement of the emergency rule. If the instructions on the emergency rule are viewed as a whole, they can hardly be construed otherwise than as conveying to the jury the plain meaning that the degree of care required of a driver confronted with an emergency is that which an ordinarily prudent person would exercise under like or similar circumstances. They clearly point out to the jury that a driver when confronted with an emergency is only required to exercise that degree of care which an ordinarily prudent person would exercise under the circumstances created by the emergency.

It is an established rule of negligence law in Minnesota "that one, suddenly confronted by a peril, through no fault of his own, who in the attempt to escape does not choose the best or safest way, should not be held negligent because of such choice unless it was so hazardous that the ordinarily prudent person would not have made it under similar conditions." Johnson v. Townsend, 195 Minn. 107, 110, 261 N. W. 859, 861; Cosgrove v. McGonagle, 196 Minn. 6, 13, 264 N. W. 134, 138; Carlson v. Sanitary Farm Dairies, Inc. 200 Minn. 177, 184, 273 N. W. 665, 669. The trial judge instructed the jury that they "may or may not find that an emergency presented itself in this case * * *." Although it is established that one who has contributed to the predicament with which he was confronted was not entitled to have his case considered under the sudden emergency rule, Lee v. Zaske, 213 Minn. 244, 6 N. W. (2d) 793, there appears to be doubt as to whether plaintiff contributed to his predicament. By not giving the emergency rule instruction, the trial judge would in effect have found the plaintiff guilty of what is tantamount to contributory negligence as a matter of law.

This court in Erickson v. St. Paul & D. R. Co. 41 Minn. 500, 506, 43 N. W. 332, 334, 5 L. R. A. 786, as regards an instruction submitting the emergency rule said:

"The sixth and last instruction complained of is but an elaborate statement of the familiar principle that where a person through the negligence of another is suddenly placed in a position of great and imminent danger, in which he is compelled, in an instant, and under the influence of excitement and fear, to decide upon and choose the means of escape, *he is not required to exercise the degree of care which a person would if possessed of coolness and presence of mind,* but only such care as would be exercised by persons of ordinary prudence placed in the same circumstances, and under a like necessity of immediate decision and action." (Italics supplied.)

The approved instruction in connection with an emergency as found in Johnson v. Townsend, 195 Minn. 107, 261 N. W. 859, was recited as a part of the charge to the jury. We have held that, if the instructions as a whole convey to the jury a correct statement of

the law applicable, they will not be disturbed because a part thereof taken out of context when considered alone might appear to convey a different meaning. We have said that instructions to the jury must be construed together and prove sufficient if, when construed as a whole, they properly state the law. Instructions to the jury must be analyzed as a whole and cannot be successfully attacked by lifting a statement out of context.[1] We find no material or prejudicial error because of the isolated statement referred to above.

The questions on this appeal are not uncommon. Speaking generally, the primary problem is what was the proximate cause of the accident. "The word 'proximate,' for the want of a better one, is generally used to designate the legal cause of an injury. The proximate cause is that which caused injury directly and immediately or through natural sequence of events without intervening independent efficient cause,* * *." 13 Dunnell, Dig. (3 ed.) § 7000. The subject of legal cause is inherently difficult, but much of its difficulty is due to the want of apt terminology. Negligence or an act in violation of statute is not actionable unless it was the proximate cause of the injury charged, even though the negligent act or omission is declared by statute to be negligence per se. 13 Dunnell, Dig. (3 ed.) § 6999.

The trial judge decided that, under the peculiar circumstances of this case, the issues of negligence, contributory negligence, and proximate cause were not free from doubt and were for the jury to decide. It seems, a reasonable conclusion, that much here depended upon the credibility of the witnesses and the weight to be given to their testimony—matters solely for the consideration of the jury.

Defendants contend, in substance, that the evidence conclusively shows that plaintiff knew or should have known of the presence of the Williamson and Shue units long before he reached them; that he had ample time to stop or slow down and thus avoid colliding with the Williamson unit; and that his failure so to do was negli-

[1]Jurgensen v. Schirmer Transp. Co. 242 Minn. 157, 64 N. W. (2d) 530; Zuber v. N. P. Ry. Co. 246 Minn. 157, 74 N. W. (2d) 641.

gence as a matter of law and the sole proximate, or at least a contributing, cause of the accident.

Plaintiff contends that defendant Shue was guilty of violation of the Highway Traffic Regulation Act. M. S. A. 169.75 prescribes that, when motor trucks or tractors of the type are operated on the night in question, they must carry flares or other signals as prescribed by statute as a part of the equipment. They must have the same on hand a half hour after sunset to a half hour before sunrise in sufficient number to be put to use if the motor truck or tractor is disabled and cannot immediately be removed from the main traveled portion of the highway, outside of a business district. The required flares or signals must be placed, as required by § 169.75, subd. 5, 100 feet in advance and 100 feet to the rear of the vehicle, and there is no distinction made therein as to whether the night when the motor truck is disabled be a clear or a dark night. Their use is prescribed for nighttime travel, and the matter of the clearness of the night and the visibility thus afforded can only go to the degree to which the act, if a violation, was blameworthy. It is not beyond doubt that the Shue and Williamson units were so disabled and especially the latter that they found it impossible to drive off the main traveled portion of the highway and thus were guilty of prima facie evidence of negligence in violation of § 169.32. This provision of the Highway Traffic Regulation Act prohibits stopping on the main traveled portion of the highway when it is practical to stop off such part of the highway unless the vehicle is disabled and found impossible to drive off the main traveled portion of the highway. The situation here gave rise to plaintiff's contention that the defendants created a hazardous condition amounting to an emergency requiring only acts necessary in an emergency situation; and that whether, under the circumstances, plaintiff was negligent in failing to avoid a collision with the Williamson unit, whether if so his negligence caused or contributed to the accident, and whether the negligence of the defendants in parking as they did and where they did, without setting out flares, was the cause of the accident, were questions for the jury and not for the court.

There is a striking similarity in the facts with the case of Johnson v. Kutches, *supra,* where the contention was made on appeal that either the plaintiff's headlights were defective or else he was inattentive as to what they revealed, and that, in either case, his negligence was conclusively established. This court found otherwise. The evidence in that case discloses that the road for more than a mile in either direction from where the truck was stopped was straight and level, passing through an open farming district. The plaintiff, however, and one of his witnesses testified that just a few moments before the crash came the glare of the headlights of a meeting motor vehicle interfered with their vision and diverted their attention. They also testified, and there was no direct contradiction, that the appearance of defendant's truck, into the rear of which the plaintiff's car crashed while it was parked on the pavement, blended with that of the pavement so that its presence could not be detected until they were within 20 feet or less thereof, though the headlights on plaintiff's car were burning brightly. In that case, however, plaintiff testified that, when nearing the approaching blinding headlights, he reduced his speed from 35 or 40 miles an hour to 20 miles per hour at the time of the impact. This court said that there was (205 Minn. 385, 285 N. W. 882) "no more than the usual conflict met with in auto accident cases, and that was for the jury." Another action growing out of the same accident is reported in Anderson v. Johnson, 208 Minn. 373, 294 N. W. 224. The testimony in that case discloses that the night when the accident occurred was clear, and there was testimony from which the jury might find that the taillight on the Kutches (defendant's) truck was lit, the same truck into which plaintiff Johnson crashed. See, Johnson v. Kutches, *supra.*

This court in Anderson v. Johnson said (208 Minn. 377, 294 N. W. 227) "The question of what constitutes proximate cause is usually for the jury unless the evidence is conclusive, and should be determined by them in the exercise of practical common sense rather than by the application of abstract principles." In commenting on the evidence, the court said that had Kutches put out flares

as required by statute they would have served as a warning to Johnson of danger in the distance as he approached from the northwest on the straight, level highway and that (208 Minn. 378, 294 N. W. 227) "Regardless of the statute pertaining to the use of flares, defendant Kutches [the owner of the truck] was required to use ordinary care commensurate with the risks involved." If anything, these cases seem less strong than the case at hand upon the proposition that the issues of negligence, proximate cause, and contributory negligence, not being free from doubt, were for the jury and not the court.

The burden of proving contributory negligence is on the defendant. Oxborough v. Murphy Transfer & Storage Co. 194 Minn. 335, 260 N. W. 305; Jenson v. Glemaker, 195 Minn. 556, 263 N. W. 624; Ames v. Cramer, 200 Minn. 92, 273 N. W. 361; Anderson v. Johnson, *supra.*

 It is our considered opinion that the inferences which may be properly drawn from all of the evidence disclosed by the record in this case, when taken as a whole, leaves the issue of proximate cause for the jury's determination, as the trier of fact. Clearly there were conflicts in the evidence. It was the prerogative and the duty of the jury to determine the conflicts in the evidence and it was their sole responsibility to pass upon the credibility of the witnesses. Ordinarily if different persons might reasonably draw different conclusions from the evidence, the verdict should not be disturbed and every doubt should be resolved in its favor. The court below has ruled in favor of the verdict rendered and, by his orders denying the motions for judgment notwithstanding the verdict or a new trial, sustained the findings of the jury. The discretion exercised by the court below, in ruling thereon, is important, and a prerogative which this court will not override unless there has been a clear abuse of discretion or a new trial or other disposition is found to be justified upon other grounds to avoid manifest injustice.[2]

We cannot say that the record in this case presents a clear abuse of discretion on the part of the trial court in determining that the

[2]14 Dunnell, Dig. (3 ed.) § 7142.

issues of negligence, contributory negligence, and proximate cause were for the jury. The orders of the trial court are affirmed.

Affirmed.

MATSON, JUSTICE (dissenting).

I dissent. After carefully considering the record as a whole, taking the view of the evidence most favorable to the verdict, I can only conclude that plaintiff is guilty of contributory negligence as a matter of law, first, because he knowingly operated his vehicle on the highway after he once knew that it was in such condition that it could not be properly steered or turned in order to avoid collisions in case of an emergency, and, secondly, for failure to keep a proper lookout by reason of which failure he did not see the Williamson trailer in time either to stop or to turn to one side to avoid the collision. In coming to this conclusion I have assumed that the rear lights on the Williamson trailer were not burning immediately before the accident.

The majority rely upon the low temperature as a factor justifying plaintiff's conduct. I cannot agree. The extremely low temperature cannot of itself be a factor which may be considered in the absence of some evidence that it was a proximate cause of plaintiff's failure to see the parked units in time to avoid the collision. Plaintiff testified that his defroster was working, that his windshield was free of dirt or anything that would impair his vision, and that he could see through it perfectly. His engine was working normally and he had no trouble with his gasline. The intense cold did, however, make the grease on the fifth wheel of his tractor-trailer unit stiff so that he had difficulty in turning. Plaintiff testified that this was a "main thing" why he could not turn out in time to avoid the collision, and he further said that he had had difficulty with the stiffness of the fifth wheel *more or less throughout his entire journey from Winnipeg.* In other words, he *knowingly* operated his truck on the highway for about 300 miles with a frozen fifth wheel which he knew deprived him of proper steering control of the vehicle. Such knowledge and conduct on his part is indicative only of his own contributory negligence. He who, after he has once dis-

covered that his vehicle is defective and cannot be properly steered, continues to operate it on the highway, except at a speed slow enough to assure him of full and instant control, is guilty of gross contributory negligence as a matter of law. Plaintiff also drove from Winnipeg with a broken exhaust pipe with the knowledge that dangerous and sleep-producing fumes were as a result being discharged beneath the cab occupied by himself and his assistant.

Aside from the 40-degree below zero temperature, the weather, road surface, and visibility conditions were excellent for highway travel. There was no fog, wind-driven snow, or other atmospheric condition to hamper a driver's vision. With the exception of a few "spotted clouds," it was a clear, bright night with a nearly full moon and the stars shining. Shadows cast over the snow, telephone poles, trees, houses, mailboxes, and the like could easily be seen without the aid of any artificial light. The 22-foot wide pavement provided excellent traction and a seven-and-one-half-foot wide tarvia shoulder was available for use on either side of the concrete. The highway east of Bluffton slopes slightly downward for about one-half mile to a creek and then, just beyond a bridge over the creek after a slight curve to the right, extends eastward in a straight line for about four-tenths of a mile up a slight incline to the place of the accident. Beyond the place of the accident the highway continues its slight eastward incline for an additional 1,000 or 1,300 feet where the incline reaches its crest.

In interpreting and depicting the character of the locus of the accident, I cannot agree with the following statement in the majority opinion:

"* * * The record is silent as to the topography of fluctation of the incline. There is nothing to indicate that it was wholly of an even plane to the extent the defendants suggest."

The pictorial exhibits and the record itself belie the above statement. The state highway patrolman, who was familiar with this road area, testified as follows when examined by plaintiff's counsel:

"Q. And is there a *steady* incline or ascending grade from the Leaf River up to and beyond the scene of the accident?

"A. Yes, sir." (Italics supplied.)

Counsel's carefully chosen question and the patrolman's positive answer establish that the slight incline, over its entire length from 3,100 to 3,400 feet, involves only a gradual change in elevation which at all times proceeds substantially in the same plane. Unless we are to disregard the record and indulge in pure speculation, we can only conclude that the slight incline involved a gradual or steady ascent in the same plane and involved no perceptible undulations. *Imperceptible unevenness in the road surface is immaterial and can provide no background into which the silhouette of a truck 8 feet wide and 12 feet high will blend and be hidden* on a bright moonlit night. This holds true regardless of any similarity in the color of the truck body and the color of the road surface.

We turn to plaintiff's conduct immediately prior to the accident. He testified that immediately prior to the collision he was driving at a speed of about 40 miles per hour. He had placed his lights on low beam when he passed an approaching car shortly after he had crossed the little bridge over the creek. He had kept the lights on low beam because he thought another car was approaching. While proceeding along the slight upgrade, plaintiff admits that with his lights on dim he could easily distinguish objects—such as mailboxes—up to a distance of 250 or 300 feet ahead. Despite such unimpeded vision for at least 250 feet, plaintiff proceeded along his traffic lane without seeing the Williamson trailer until it was only 75 feet away. According to his own testimony he traveled another 40 or 45 feet while he was attempting to apply the brakes and to turn to the left. In the remaining 30 feet he turned about 4 feet to the left with the result that the right front of his tractor struck the Williamson unit and drove the same against the Shue unit. Apparently plaintiff's brakes did not take hold until approximately the moment of the impact.

The majority opinion seeks to justify plaintiff's failure to see the Williamson trailer in time to stop, or in time to turn his vehicle

sufficiently to avoid a collision, on the grounds that he saw no lights or reflectors on the rear of the Williamson trailer; that the aluminum trailer body presented a dirty-gray color which blended into the color of the concrete pavement; and further because the Shue and Williamson units were standing on an upgrade so that the only background afforded them was a concrete highway at night whereby they did not appear in clear relief by being silhouetted against the sky.

Although I accept as true plaintiff's contention that no lights were burning on the rear of the Williamson trailer, I cannot agree with the majority opinion's conclusion that the jury might have found that the reflectors on the Williamson unit were covered with dirt and snow which rendered them ineffectual as warning signals and thus further excused plaintiff's failure to see the trailer. There is no support in the record to show that the back end of the Williamson unit (unit No. 2), with which plaintiff collided, was covered with dirt or snow so as to conceal or render ineffectual either the red reflectors or the red lenses of the taillights. A photograph introduced in evidence, *which plaintiff himself testified showed substantially the condition of the back end of the trailer when he collided with it,* demonstrates beyond all reasonable doubt that the reflectors and taillights were free of snow and dirt. This is corroborated in part by five witnesses who all testified that, when the driver of the Williamson unit stopped at Perham for coffee, the rear lights of the unit were clearly visible. There was no precipitation, or blowing snow or dirt of any kind, which could have covered the rear end reflectors while the unit traveled the 18 or 20 miles on a bare concrete pavement from Perham to the scene of the accident. Apparently the majority have been misled by the photographic exhibit of the snow-covered rear end of the Shue unit which was parked directly in front of the Williamson unit which completely shielded it from plaintiff's vision. The Shue unit had been covered with snow while passing through Washington, Idaho, and Montana in a snowstorm. We are not here concerned with the rear signal lights or reflectors on the Shue unit. Furthermore, any assumption that the

headlights of the Williamson tractor shone on the rear end of the Shue trailer and thereby caused a diffusion of light which misled the plaintiff into believing that he was encountering another car has no foundation whatever in the record and belongs wholly to the field of conjecture. The evidentiary base of a verdict must be found in the record and not in the realm of speculation.

Upon no reasonable theory of the evidence can a justification be found on the ground of distracting circumstances for plaintiff's failure to see the Williamson trailer in time to avoid the collision. The night instead of being dark was unusually bright. Admittedly plaintiff's headlights enabled him to distinguish objects 250 or 300 feet ahead. Contrary to the holding of the majority opinion, there were no distracting circumstances to divert plaintiff's attention. The majority opinion overlooks the significant fact that plaintiff did not at any time claim that he was suddenly blinded by the glaring headlights of any approaching car. His only testimony is that somewhere on the four-tenths of a mile pavement (or over 2,100 feet) between the Leaf River bridge and the point of collision he dimmed his lights for an oncoming car. This fact is of no significance since it is the general rule that:

"When automobiles meet at night each driver must anticipate the possibility of interference with his vision by the headlights of the other car, and if he cannot see the road beyond it, must have his own machine under such control as will enable him to stop immediately, or within such distance as he can see ahead."[3]

The normal and regular flow of oncoming headlights on a highway is one of the reasonably expected hazards with which every motorist must cope in the exercise of due care, and before he can be excused for failure to exercise such due care, he must show that in the moment of peril when confronted by one danger his attention was diverted by some other independent circumstance which also *reasonably portended danger*. Here the approaching car, wholly removed from the locus of the accident, provided for plaintiff no such dis-

---

[3] 2 Berry, Law of Automobiles (7 ed.) § 2.460.

tracting circumstance justifying any reasonable apprehension of danger. He testified that he did not switch his lights off dim because he thought other lights were coming over the grade or hill crest. It must be remembered that the crest of the incline was located from 1,000 to 1,300 feet east of the accident scene and that plaintiff was then a considerable distance to the west of the point of collision. Whatever plaintiff may have seen, or imagined that he had seen, he was confronted with no circumstance which provided him with any reasonable basis for apprehending danger so as to justify a diversion of his attention from the road ahead and excuse his failure to see the parked trucks located between him and the hill crest. Despite the fact that he had his headlights on dim, he frankly admitted that he could clearly discern objects for a distance of 250 feet ahead. There is no reason why, in the exercise of the alertness of ordinary care, he should not have seen at least the silhouette of the parked vehicles.

The majority opinion's theory of distracting circumstances has no basis either in fact or in law. Unlike the factual situations in Johnson v. Kutches, 205 Minn. 383, 285 N. W. 881, and in Brown v. Raymond Bros. Motor Transp. Inc. 186 Minn. 321, 243 N. W. 112 (cited in the majority opinion), wherein the vision of the respective drivers was interfered with and diverted by glaring and blinding headlights of cars suddenly approaching from the opposite direction, plaintiff here was faced with no oncoming lights since the headlights on the parked Shue and Williamson units were directed in the same direction as plaintiff was traveling. Any diffused light from the Shue and Williamson headlights, instead of portending danger as to be a source of distraction, would serve to illuminate, accentuate, and disclose to plaintiff the parked vehicles. It is both elementary and clear that in order to find distracting circumstances which will excuse what is otherwise negligent conduct "there must be not only another danger from which attention may be diverted, *but also that the circumstances relied upon as distracting must be such as*

*of themselves may reasonably be considered to portend danger.*"[4] (Italics supplied.)

The Williamson trailer (as well as the Shue unit) was 12 feet high and 8 feet wide. Despite the dirty or silver-gray color of the trailer body, plaintiff ought to have seen it since it was equipped with red glass reflectors, one on each of the rear lower corners. Furthermore, the wheels and undercarriage were of a dark color which would not naturally blend with the pavement. In addition, on this clear, moonlit night the trailer, both within and beyond the admitted range of plaintiff's headlights, must have been outlined against the horizon and presented a silhouette visible to any approaching driver proceeding with the alertness of ordinary care. Plaintiff's contention that no silhouette was presented because of the slight upgrade extending to a crest 1,000 or 1,300 feet away does not, as already indicated, accord with the physical facts. Obviously where, on a bright, moonlit night, one vehicle follows or approaches another vehicle on a straight upgrade which is so gradual and uniform that both vehicles are traveling in the same plane except as to *imperceptible* pavement undulations, the vehicle ahead cannot possibly blend with the pavement so that its bulk and outline (here 8 feet wide by 12 feet high) will be concealed from the driver of the vehicle to the rear.

Plaintiff testified he could apply his brakes and stop within 250 feet or within the space illuminated by his headlights. Obviously, *except as he was prevented by his own negligence in driving with a frozen fifth wheel which prevented normal steering or turning,* plaintiff could have turned into the clear onto one of the wide road shoulders in a very much shorter distance. Under the circumstances, without ignoring any of them, his failure to see the parked vehicle before a collision was inevitable can reasonably be construed only to mean that he neglected to exercise ordinary care in using his eyes to see what was obviously discernible in front of him.

---

[4]Dreyer v. Otter Tail Power Co. 205 Minn. 286, 290, 285 N. W. 707, 709, 287 N. W. 13; City of Radford v. Calhoun, 165 Va. 24, 181 S. E. 345, 100 A. L. R. 1378; Carbone v. Boston & Maine R. 89 N. H. 12, 192 A. 858; see, 3 Blashfield, Cyc. of Auto. Law and Practice (Perm. ed.) § 1748.

In respect to its controlling facts, the instant case falls within the rule of Orrvar v. Morgan, 189 Minn. 306, 249 N. W. 42, as the rule of that decision is delimited by its own operative facts and by subsequent decisions. In the Orrvar case plaintiffs' son Robert, who was driving his parents' car at an approximate speed of 30 miles per hour, struck the rear of defendant's stalled truck, which he was endeavoring to remove from the highway. It appears that Robert had his headlights on dim. He testified that he did not see the truck until it was too late to turn out to avoid striking it. Robert further testified that he could see approximately 25 to 30 feet ahead of the car. A mechanic testified that the lights when dimmed should provide sufficient illumination to make an object clearly discernible at 150 feet under normal conditions. There was testimony tending to show that defendant did not have a lighted taillight on his truck. The accident occurred on a clear summer night, and the road was dry. It was held on appeal that Robert was contributorily negligent as a matter of law since, if he could see only 25 or 30 feet ahead as he testified, he was overdriving his lights; and, if he could see 150 feet away as the mechanic testified, he failed to use his eyes and to see what was obviously in front of him. It is not claimed here that plaintiff was overdriving his headlights. That is, plaintiff could have brought his unit to a stop within the distance illuminated by his headlights. However, the alternative Orrvar holding that the driver was guilty of contributory negligence for the reason that he failed to use his eyes and to see what was obviously in front of him is controlling since the facts in the case at bar are even more compelling than those of the Orrvar case in establishing negligence as a matter of law.

In the instant case we have a night which was not merely clear but was so unusually bright that objects were discernible at a great distance without the aid of any artificial lights. In addition, plaintiff's headlights, even though on low beam, illuminated the road for 250 to 300 feet ahead to such an extent that a reasonably alert driver could not fail seasonably to discover objects in his lane of travel. We here also have red reflectors which naturally did not blend into

the pavement under the glare of oncoming headlights. Usually contributory negligence as a matter of law is based on no single or controlling circumstance but rather on a combination of circumstances arising from a consideration of all phases of the individual case. It follows that no fixed rule is to be deduced from our decisions to provide a uniform and infallible test for determining when contributory negligence is for the jury and when it is not. It is for this reason that the Orrvar case has been frequently distinguished to confine its authoritative effect to its own peculiar facts.[5] Within its peculiar facts, the rule of the Orrvar case is still in effect, and that rule is strikingly applicable here. Easily distinguished on its facts is the case of Wicker v. North States Const. Co. Inc. 183 Minn. 79, 235 N. W. 630, wherein a concrete mixer was left in the middle of the road by a construction crew on a *dark* night.

I am of the opinion that the orders of the trial court, denying defendants' motions for judgment notwithstanding the verdict or a new trial, should be reversed on the ground that plaintiff is guilty of contributory negligence as a matter of law.

KNUTSON, JUSTICE (dissenting).

I agree with the dissent of Mr. Justice Matson.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.

---

[5]See, Jurgensen v. Schirmer Transp. Co. 242 Minn. 157, 64 N. W. (2d) 530, and cases cited therein; Schubitzke v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 156, 69 N. W. (2d) 104.